UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LILLY INVESTMENTS, LLC, a
Michigan limited liability company,
DENTISTS ON MAIN, P.C., a
Michigan professional corporation, and
LOUIS E. LEONOR, an individual,

                              Plaintiffs,           Civil Action No. 14-10712
                                                  Honorable Judith E. Levy
                                                      Magistrate Judge David R. Grand

       v.

CITY OF ROCHESTER, and
PLANNING COMMISSION OF
THE CITY OF ROCHESTER,

                              Defendants.
_____/

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANTS' MOTION TO DISMISS [30]

      This case concerns Plaintiffs Lilly Investments, LLC, Dentists on Main, P.C., and Louis E. Leonor's (collectively, "Plaintiffs") efforts to turn a City of Rochester home that was built in 1878 into a dental office, and the City's desire to see the renovation project completed in a manner that preserves certain alleged historical aspects of the property. After all sides invested a great deal of time and energy in the project without the Plaintiffs obtaining the approvals necessary to complete the project, Plaintiffs filed a complaint, containing both state and federal claims, in Oakland County Circuit Court. Defendants City of Rochester and Planning Commission of the City of Rochester (collectively, "Defendants") removed the action to this Court, took other affirmative steps to litigate in this Court, and have now moved to dismiss it, arguing that the Court lacks subject matter jurisdiction over the claims, and that certain claims

fail to state a claim upon which relief can be granted. [30]. Plaintiffs filed a response [55], and Defendants filed a reply. [58]. An Order of Reference was entered referring Defendants' motion to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). [32]. The Court held oral argument on the motion on June 23, 2014, and took it under advisement.

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Motion to Dismiss [30] be **GRANTED IN PART AND DENIED IN PART**.

## II.    REPORT

### A.    Background

#### 1.    *Factual Background*[1]

Plaintiffs own (or allegedly have an interest in) a house located at 209-211 Walnut in Rochester, Michigan (the "Property"), which they acquired with the intent to demolish it and replace it with a modern dentistry facility. (Am. Cplt. ¶¶8, 9, 12). To do so, they needed approval from the City of Rochester's Planning Commission (the "Planning Commission" or "Commission"). (Mot. Ex. G). Plaintiffs contend that the existing house, originally built around 1878, had suffered fire and mold damage, had walls and ceilings containing asbestos, and did not conform to existing building codes or access standards. (Am. Cplt. ¶11). Defendants contend

---

[1] Because Defendants' motion primarily seeks to dismiss Plaintiffs' complaint on jurisdictional grounds, and attacks the factual basis for the Court's jurisdiction, the Court may go beyond the face of the complaint and consider the evidence presented by the parties. *See Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014) (on motion to dismiss based on factual lack of jurisdiction, court has "broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case."). Therefore, the background set forth here reflects the full relevant present record. In later portions of this Report and Recommendation, where the Court discusses Defendants' argument that certain of Plaintiffs' claims should be dismissed for failure to state a claim under Rule 12(c), the Court will refer only to those facts that appear in the complaint or are matters of public record, in order to comply with the standard for dismissal under that Rule.

that the residence had been designated as having historical significance in the City.  Defendants'

documents show that a report was generated on the Property's historic significance, and at an

initial Planning Commission hearing, a liaison from a Historical Society[2] felt that it was

important to save certain elements of the house with purported historical significance.  (Mot. Ex.

A Tab 2 at 3, Tab 4).  However, according to Plaintiffs, there is no such official designation in

the City of Rochester, and the Property is not located on any local, county, state or national

historic register.

On September 12, 2011, Plaintiffs[3] submitted a site plan approval application to the

Planning Commission that included demolition of the existing structure and onsite parking.  *Id.*

Tab 1.  On September 15, 2011, the Planning Commission met to discuss the plan.  *Id.* Tab. 2.

At the meeting, the City Planner reported on her initial review of the plan, noting its deficiencies.

*Id.*  A Historical Society liaison then spoke and voiced concerns about the plan's proposal to

demolish the existing structure, given its historic nature.  *Id.*  The Commission then discussed

with Plaintiffs the fact that the existing structure was in a state of disrepair.  *Id.*  Plaintiffs'

architect noted that retention of the existing structure would prevent the creation of onsite

parking and that it would be financially impossible to renovate the building without the City

---

[2] Some of the City's exhibits refer to a "Historical Commission" (*e.g.,* Mot. Ex. A Tab 2 at 3), but the body seems to refer to itself as the "Rochester Avon Historical Society." *Id.* Tab 4.  For ease, the Court will refer to this body as the "Historical Society."  It should further be noted that it appears the Historical Society is not an official body within the City of Rochester, but an independent group of individuals who, according to their website, seek "to help preserve, collect and interpret the history of the greater Rochester area for present and future generations."  *See* http://www.rochesteravonhistoricalsociety.org/.

[3] It appears that "Louis Leonor DDS" was the actual "applicant."  *Id.* at 3.  For ease, however, the Court will use "Plaintiffs" and "applicant" or "applicants" interchangeably.

3

waiving the statutorily required parking fees.  *Id.*[4]  It was noted that the Property was located in the Special Project District.  *Id.*  At the conclusion of the meeting, the plan was tabled and the Commission agreed to schedule a site plan application approval meeting.  *Id.*

Plaintiffs submitted a second plan on October 4, 2011, that again called for the demolition of the existing structure, but that would replace it with a building in the same style as the original house, which would require a waiver of the payment-in-lieu of parking requirement. *Id.* Tab 6.  At a Commission meeting on November 7, 2011, after reviewing a report of the City Planner again noting deficiencies in the site plan, various Commission members voiced concerns over the continued lack of intent to restore the existing property, as well as the issue regarding parking.  *Id.*  The Commission voted to hold a public hearing on the request for special project status, which would be required for such a plan.  *Id.*

On November 18, 2011, in response to the Commission's concerns about the site plan, Plaintiffs sent the Commission a letter stating that they would "retain the original single family residence portion of the structure," which would serve as the administrative office for a proposed single story addition with duplicated architectural styles.  *Id.* Tab 9.  Plaintiffs also sought a waiver of the payment-in-lieu of parking requirement and agreed to retain two 30' spruce trees, of six trees existing on the property.  *Id.*  Plaintiffs included in their letter a revised site plan incorporating these changes.  *Id.* Tab 10.  The plan made reference to the United States Secretary

---

[4] The City had previously passed a resolution that provided an option of "payment-in-lieu of providing off-street parking where it can be demonstrated that the reasonable and practical development of property precludes the provision of required off-street parking."  [30, Ex. L]. The fee for such payment was set as $12,000 per space, and the number of spaces to be paid for by a particular property owner was determined by a formula that was based on the square footage of the development.  *Id.*; Rochester Zoning Ordinance ("RZO") § 2403.

of the Interior's guidelines for historic redevelopment or "SOI standards"[5] but contained no promise or commitment to comply with those standards. (Plf. Resp. Ex. 4). Upon review, the City Planner noted three remaining deficiencies in the plan: (1) that no proposed building materials were included for the new addition, (2) that the type and number of exterior lighting fixtures needed to be specified and shown on the elevation drawings and that (3) there needed to be a copy of a hazardous waste agreement on file with the City. *Id.* Tab 12. Ultimately, the City Planner recommended the plan be sent to the City Council "for input and recommendations." *Id.* A Commission meeting was held on December 5, 2011, where the plan was again considered. *Id.* Tab 13. The Commission agreed that although the plan appeared a little "too loose" to act on, it was sufficiently specific to be forwarded to the City Council for review. *Id.*

In a letter dated December 14, 2011, Plaintiffs again reiterated their intent to "retain the original single family residence portion of the structure" while adding a single story addition in the back that would incorporate the same architectural style. *Id.* Tab 14. The letter also calculated the number of parking spaces needed and requested a waiver for those spaces. *Id.* Finally, it increased the number of trees to be retained from 2 to 3, which included a purported Chinese Elm tree. *Id.*; Tab 11. At a Commission meeting on December 19, 2011, the City Council voted to refer the "Special Project" proposal back to the Commission "with a favorable view of the project." *Id.* Tab 14. In the minutes, City Manager Jaymes Vettraino remarked that the parking requirement "could be waived as part of the Special Project approval." *Id.*

On January 4, 2012, the Commission continued its consideration of the site plan. *Id.* Tab 15. A report from the City Planner noted that the project was now at the "PC action on project"

---

[5] Compliance with the SOI standards is required for a property owner to receive federal tax credits for rehabilitation. 36 C.F.R. 67. The standards include ten principles to which a property owner must adhere when rehabilitating an historic property. *Id.*

stage, the last stage in the approval process.  *Id.*  Her report further noted that the plan proposed to retain "590 square feet of the existing historic dwelling along Walnut Avenue frontage, demolish the remaining portion of the building and construct a new 3,895 square foot addition." *Id.*  One of the features to be retained was the "existing two-story façade along Walnut Avenue." *Id.*  The plan also now called for the preservation of 3 of the 6 existing trees on the property.  *Id.* The City Planner noted a report from architect Edward Francis that demolition of the rear portion of the house "would preclude placement of this structure on the National Register of Historic Places and the State Register."  *Id.*  The Commission members asked Plaintiffs' architect, Peter Stuhlreyer, to comment on Francis's report.  *Id.* at 6.  However, an architect who consulted for both sides,[6] John Dziurman, responded that Francis's statements were "applicable to an historic district, which Rochester currently does not have."  *Id.* Tab 15 at 6-7.  He opined that giving the project "special project" status would give the Commission more control over it, and "allow them to act somewhat like an historic district commission in this instance."  *Id.* at 7.  He did note, however, "that it was the goal to make the project Historic District compatible."  *Id.*  The Commission again noted that it did not have a complete package to review, and tabled the proposal.  *Id.*  The Commission requested a final site plan, Dziurman's written response to Francis's report, and a written analysis of the parking situation, including a parking study.  *Id.*

The site plan was again taken up at the February 6, 2012 Commission meeting.  *Id.*  Tab 16.  The City Planner again reported that the plan called for retention of the façade frontage along Walnut, and demolishment of the remainder of the original structure.  *Id.* at 2.  The plan called for the removal of the purported Chinese Elm tree due to its condition.  *Id.* at 19. Preservation of this tree was discussed, and it was determined that it did not qualify as a

---

[6] *Id.* Tab 44.

landmark tree. *Id.* at 4. After further discussion, including how to incorporate the SOI standards into approval, the Commission voted to approve the Special Project designation "as presented, with the conditions noted in the Planner's Report" as well as the following conditions:

> (1) That the project demonstrate reasonable compliance with the Secretary of the Interior Standards for Rehabilitation as presented in Mr. John Dziurman's letter of December 31, 2011, and in case of a disagreement between the two parties, an outside expert will be selected by City Administration and paid for by the applicant. The outside expert will reference the Secretary of Interior Standards . . .

> (2) That the applicant obtain an agreement with the owner of the adjacent parking lot to create an entrance to the property through the parking lot wall and to re-purpose some spaces for handicapped parking. A copy of this agreement will be submitted to City Administration.[7]

> (3) That the applicant save the Chinese Elm tree on the site.

*Id.* at 4-5.

At the same meeting, the Commission considered a site plan for redevelopment of another historically significant property, the "Chapman House" at 311 Walnut Street, on the same street as the Property, and also in the Special Project District. (Plf. Resp. Ex. 5). The Chapman House was also being considered for "special project" status, but the redevelopment plan involved retention of only the footprint of the existing structure, and included new elements such as an elevator, a restaurant, an outdoor pergola structure, a small storage structure, and an eight foot high garden wall. *Id.* The applicants agreed to preserve "almost all the existing features and details . . . with the exception of those that need repair or replacement." *Id.* The applicants requested a 13-space parking waiver as part of their application. *Id.* The application did not call for compliance with any specific historical preservation standards, including the SOI standards, as part of its special project approval. *Id.* The site plan was tabled pending more

---

[7] Such an agreement was reached on April 18, 2013. *Id.* Tab 17.

information.  *Id.*  The project was ultimately approved with no reference to compliance with SOI or other historical standards.  (Plf. Am. Mot. for Prelim. Inj. Ex. 23).

In late May 2012, Plaintiffs were issued a building permit and began construction.  (Plf. Resp. Ex. 10).  However, on October 26, 2012, the City condemned the Property for various reasons, including "undermining of public and private property causing a threat to health, safety and welfare of the public," referring to an excavation that had occurred that was undermining an adjacent property's wall, "construction trespass" that was the result of the over-excavation, and "an attractive nuisance," apparently related to the City's allegation that Plaintiffs were "in violation of [the] approved Site Plan."  (Mot. Ex. A Tab 19).  City Manager Vettraino's condemnation letter chastised Plaintiffs for having a site "under construction without owner supervision and without ability to contact," referencing Vettraino's, the Deputy City Manager's, and the City Building Inspector's unsuccessful attempts to reach Plaintiffs to discuss the matter. Vettraino's letter further specified:

> as part of the special project approval, preservation of the front part of the building is an absolute requirement.  While you may have the opportunity to still comply with the preservation requirements as provided for in the Special Project approval, the City requests a plan, in writing, describing the work that has occurred to date regarding the historic preservation and a detailed plan for the restoration of the front part of the building.  This shall be provided no later than November 5, 2012 at 5 p.m., or the City shall consider you in violation of your Special Project approval and take necessary enforcement action.

*Id.*

At a Commission meeting on November 5, 2012, the Commissioners noted that the Chinese Elm that Plaintiffs had agreed to preserve, had been accidentally removed[8] and that the

---

[8] According to Plaintiffs' architect, the tree in question turned out to be a Mulberry tree.  (Plf. Resp. Ex. 2 ¶10).  He also claims that it was clear to all at the meeting that the tree may not survive and might have to be removed.  *Id.*  Finally, he states that he later learned the tree was

construction issues had been the result of plaintiff Leonor's absence while he was out of town.

*Id.* Tab 20.  The Commission voted, among other things:

> (1) [to] require [Plaintiffs] … to provide a construction timeline to the Administration; (2) for Administration and John Dziurman to review and provide comments on the letter from [Plaintiffs' architect] dated November 5, 2012 and for Mr. Dziurman to provide those comments to Administration; (3) those combined comments will be sent to the owner/applicant for review and compliance, with any concerns over those observations to be brought before the Planning Commission for resolution; (4) for the Commission to review a modified landscape plan which will be provided no later than the end of February 2013.

*Id.*  A letter reflecting these exact requirements was sent to Plaintiffs by City Manager Vettraino

on November 16, 2012.  *Id.* Tab 21.  The letter made clear that Plaintiffs were to provide the

construction timeline by November 30, 2012, and the modified landscape plan by February 22,

2013.  *Id.*

On December 3, 2012, architect Dziurman also issued a report addressing Plaintiffs'

compliance with the SOI standards.  *Id.* Tab 22 at 8-13.  Dziurman's report was based on his

understanding that the project "shall comply with the [SOI] Standards" not simply "reasonably

comply," though, as discussed in the next paragraph, his understanding differed from what the

Commission actually required.  *Id.* at 8.  He concluded his report with seven recommendations to

bring the project into compliance.  *Id.* at 12.  At a meeting of the Commission that same day,

certain members commented that there appeared to be no restoration occurring at the Property,

and that instead it appeared that the Property was being gutted.  *Id.* Tab. 23.

On December 28, 2012, City Manager Vettraino sent a letter to the Commission about the

project, noting that the "primary concern at this point with the project is its compliance with the

Planning Commission's condition of . . . reasonable compliance with the [SOI] standards."  *Id*.

rotting from the inside, which precipitated its later removal.  *Id*.  Defendants do not rebut these assertions.

Tab 22.  City Manager Vettraino then noted that the City Attorney had requested a special closed session to review his opinion on the Commission's options if it determined that the Plaintiffs had not complied with the conditions of special project approval.  *Id*.  The letter further stated that Vettraino believed there was a disagreement between the parties regarding compliance and that the Commission should invoke its option to solicit the assistance of a preservation expert to resolve the disagreement, which would take place at the conclusion of the project's construction.  *Id*.  Until then, Vettraino stated that the Administration believed it was proper for the project to proceed with construction, based on assurances from Plaintiffs.  *Id*.

At a January 7, 2013 meeting, the Commission decided to enlist the assistance of a preservation expert (at Plaintiffs' expense) to resolve the dispute between the parties as to the project's reasonable compliance with the SOI standards.  *Id.* Tab. 24.  The Commission also noted concern about the removal of the Chinese Elm, and agreed to discuss it once Plaintiffs submitted an amended landscape plan.  *Id.*  On February 22, 2013, architect Edward Francis, who was engaged as the "preservation expert," issued a report (the "Francis report") detailing the project's deficits, and concluding that it "meets only in part" the SOI standards.  *Id.* Tab 27. at 6.  He stated that despite this, he "believe[s] that the property would still be recognized as contributing to a potential Historic District."  *Id.*  He also stated his impression that "all parties involved have had the best intentions," and that, in the future, "a clear review process would avoid the design issues that have plagued this development."  *Id.*  On March 4, 2013, the Commission met with Francis and reviewed his report.  *Id.* Tab 28 at 5-11.  Francis is reported to have said during the meeting that the project, as of that time, was "more non-compliant than compliant" with the SOI standards.  *Id.* at 118.  The Commission further agreed to receive the report, set a public hearing, and allow Plaintiffs to respond.  *Id.*

10

The Commission met again on March 26, 2013, where Plaintiffs submitted an amended landscape plan. *Id.* Tab 29. The Commission discussed ways to remedy the removal of the Elm, including donation to a tree fund. *Id.* Plaintiffs' architect gave a presentation in response to the Francis report. *Id.* The Commissioners discussed the fact that the "conflicting expert opinions created a very grey area" and the fact that, in granting special project status the Commission "did not give specifics but a reasonable adherence to the [SOI] standards, which has a broad range [o]f interpretation." *Id.* When asked for "concrete items" that were troubling them about the project, one Commissioner noted the removal of the Elm, and compliance with the SOI standards. *Id.* One member noted the possibility of "revocation of the Special Project status" for noncompliance. *Id.* Another member questioned the definition of "reasonable compliance" and noted that there should be a definition of this phrase. *Id.* A special meeting was scheduled, but no further recommendations were given to Plaintiffs at this meeting. *Id.*

On April 1, 2013, the Commission held a special meeting to tour the Property. *Id.* Tab 30. Afterward, the Commission discussed the Property's noncompliance, and then closed the public hearing. *Id.* The Commission agreed that the Francis report revealed noncompliance with the standards and that Plaintiffs would need to provide solutions. *Id.* Afterward, Plaintiff Leonor asked about who hired architect Dziurman, stated he had put a lot of effort into the project, and then left the meeting. *Id.* According to Plaintiffs' architect, Stuhlreyer, he met with Dziurman and Oakland County historic architect Ron Campbell in April 2013, a meeting that produced an April 25, 2013 letter from Ron Campbell outlining approximately 15 feasible recommendations and addressing the issues raised in Francis's report. (Plf. Resp. Ex. 2, ¶¶19-21 and Ex. A). Stuhlreyer asserts that at the end of the meeting the City Manager instructed him to proceed with construction and make the recommended changes. *Id.* Those changes were made

11

prior to an eventual stop work order issued in May 2013.  *Id.* ¶23.

The Commission met again on May 6, 2013, and received a report from the City Planner recommending acceptance of Plaintiffs' amended landscape plan as a remedy for the removal of the Elm.  (Mot. Ex. A Tab 31).  The Commission agreed to send the plan to the City Council for comment and return.  *Id.*  At the meeting, Plaintiffs' architect noted that a number of the items on the list of proposed changes (encompassed in Ron Campbell's April 25, 2013 letter)[9] were completed, and the mayor *pro tem* commented that the items had been undertaken "without communicating to the Commission prior to the action and appeared to form a pattern."  *Id.*; Plf. Resp. Ex. 2 ¶22.  The Commission then discussed "a process that would give the 209 Walnut project an opportunity to reacquire approval."  (Mot. Ex. A Tab 31).  At least one member "expressed concerns that any actions taken by the Commission might be viewed as punitive in view of the grey area of dispute as to whether or not the project achieved compliance with the [SOI] standards."  *Id.*  The Commission then moved to consider an amended site plan that included the following requirements: (1) a contribution to the tree fund of $5,040.00 to offset the Elm's removal, (2) the inclusion of fees to be borne by the Plaintiffs for additional undertakings by the Commission, (3) the development of a formula to justify payment into the parking fund to account for the real use value of the parking lot, (4) and the execution of a maintenance easement between the Property and its neighbors.  *Id.*  The Commission agreed that that the amended site plan would be developed and reviewed by the Administration before presentation to the Commission.  *Id.*  The Commission further agreed that submission of such an amended site plan "would warrant approval of [the] amended site plan as well as preservation of the special project status."  *Id.*

---

[9] Plf. Resp. Ex. 2, Ex. A.

On May 28, 2013, City Manager Vettraino sent the Commission a letter noting that the Administration had met with the Plaintiffs regarding the revised site plan and was under the impression it would be receiving revised documents promptly, which it did not. *Id.* Tab 33. City Manager Vettraino then issued a stop work order on the Property for failure to follow the original site plan and failure to respond to the Commission's "request for additional consideration as part of a process to bring the project into conformance with a new Site plan." *Id.* The letter stated that the Administration believed the Commission's options were either to continue the stop work order pending a response from Plaintiffs to the Commission's May 6, 2013 request, or consider the information provided at the May 6 meeting to be adequate and direct Plaintiffs to prepare a modified site plan based on the April 25, 2013 letter. *Id.* The Administration also believed that if Plaintiffs offered additional information at the next meeting, the Commission should consider it and provide direction to the Administration as to whether:

> it will continue to work through an approval process with the applicant while the project is either under a stop work order for not being compliant with [sic] Site plan, or [] it should be considered an open project undergoing review by the Planning Commission in an attempt to bring the project into compliance under a new Site plan.

*Id.*

At a June 3, 2013 Commission meeting, the mayor *pro tem* made extensive comments about his displeasure with the project, including that Plaintiffs failed to respond to the Commission's last request and failed to appear at the meeting. (Plf. Resp. Ex. 17). He recommended continuing with the stop work order. *Id.* A motion was passed to continue the stop work order "until such time as a proposed plan for either an amended site plan or a mediation as to the existing site plan can be brought before the Planning Commission and approved prior to any work being done on the site," and direct the Administration to inform

Plaintiffs of such.  *Id.*  On June 5, 2013, City Manager Vettraino sent Plaintiffs a letter reiterating the Commission's decision to continue the stop work order until Plaintiffs were ready to "resume the process of reviewing site plan compliance and special project compliance . . ."  (Mot. Ex. A Tab 37).  The letter asked for documents by June 19, 2013.  *Id.*

On July 27, 2013, the City Planner sent a letter to the Commission outlining a revised site plan Plaintiffs had submitted on July 9, 2013.  *Id.* Tab 38.  Upon review, the City Planner noted that the Commission never formally approved the plan modifications contained in the April 25, 2013 letter, which outlined 16 items Plaintiffs sought to modify and correct in an attempt to bring the project into compliance (many of which Plaintiffs had already completed allegedly at the direction of City Manager Vettraino).  *Id.*; Plf. Resp. Ex. 2 ¶¶19-22.  She suggested, however, that if the Commission was satisfied with those modifications then "action should be taken, to accept the site plan modifications, provided the landscape plan is appropriately updated . . . porch rail is constructed of authentic wrought iron and the details of the floodlights are submitted."  *Id.*  The City Planner stated that if the Commission wanted further modifications, "a record should be made of those requests."  *Id.*  The City Planner recommended continuing the stop work order until either the Commission approves a new site plan or directs the Administration that it is satisfied with the progress made toward final approval of a new site plan.  *Id.*  In the alternative, she suggested that if the Commission accepts the modified site plan, then it should be sent to City Council for comment, which "would be consistent with the special project review process that was used to initially approve this development."  *Id.*  Upon receiving comment, the Commission "would consider final approval of the new site plan."  *Id.*  The City Planner noted that the amended landscape plan had already been approved, but that a copy of it was not in the present packet.  *Id.*

14

This report was received and considered by the Commission at a meeting on August 5, 2013, where it was noted that the process for re-approval outlined by the City Planner was the one in place at the time of initial approval, "not the current process being followed." *Id.* Tab 39. The Commissioners debated whether Plaintiffs had complied with their last set of instructions, noting that Plaintiffs had submitted a site plan showing the Project as-built, but had not provided a solution to the alleged deficiencies or an explanation for those deficiencies. *Id.* Although claiming that Plaintiffs had also not supplied information regarding additional expenses incurred by the Administration, City Manager Vettraino stated that such expenses had been reimbursed by Plaintiffs. *Id.* The Mayor stated that the Commission needed "to move forward and not have any more meetings on this; that clear direction should be given to the applicant." *Id.* The Commission ultimately passed a motion that the City Attorney and Plaintiffs' counsel would develop an agreement that outlined, in pertinent part, "(1) definition of terms under which the stop work order might be removed, including terms of granting a Certificate of Occupancy; (2) the applicant[], in return for removing the stop work order waives certain rights and claims against the City, which will be outlined in the agreement…" *Id.* The motion also sought a memorandum from the City Attorney responding to a July 29, 2013 letter from Plaintiffs' attorney (which is not in the record). *Id.*

At a September 4, 2013 meeting, the Commissioners passed a motion directing the Administration to consult (at Plaintiffs' expense) with a third party to develop a formula to pay into the parking fund based on criteria developed at the May 2013 meeting. *Id.* Tab 40. The Commissioners believed this was an appropriate course of action based on "the record of interaction and the applicant letter of August 27, 2013[10] and the failure of the applicant's

---

[10] This letter is not in the record.

attorney to respond or be present at this meeting…" *Id.*  On September 19, 2013, Plaintiffs'

architect sent City Manager Vettraino a letter discussing the cost of the project compared to the

original plans.  *Id.* Tab 41.  On October 1, 2013, at the Commission's request, architect Francis

issued a second report on the project's compliance with the SOI standards ("Francis' second

report").  Francis' second report, which was allegedly not provided to Plaintiffs, found that while

the project still did not fully comply with the SOI standards, it was now "reasonably compliant"

with those standards.  (Plf. Resp. Ex. 2, ¶ 28, Ex. 23 at 7).  Francis specifically concluded that

"the design, while improved, does not meet the [SOI] Standards for Rehabilitation if seeking

Certification for Federal Historic Tax Credits.  I suggest that Federal Historic Tax Credits

requires an exceptionally high standard, slightly below Museum Quality when applied to exterior

work."[11]  He concluded that "the work is reasonably compliant with the standard and does fit

with the existing residential character in the neighborhood." *Id.*

City Manager Vettraino sent Francis an email in response to Francis' second report

stating "As we discussed, I think a statement is needed recognizing that it is the [Commission]

that ultimately will define reasonably compliant" and suggesting additional language Francis

should include in his report reflecting that position.  *Id.* Ex. 24.  Indeed, in a revised version of

Francis's second report, also allegedly not provided to Plaintiffs, Francis did include the

suggested language:

> "Reasonably compliant" is a standard noted by the Rochester Planning
> Commission and I suggest that it would be less than the standard required
> by the "Secretary of Interior Standards for Rehabilitation" for State or
> Federal tax credits.  As the creator of the standard I recognize that the
> Rochester Planning Commission must use its judgment in defining what is

---

[11] There is no indication in the record that Plaintiffs were seeking such credits, and, as noted above, *supra* at 9, Defendants' "primary concern" was that Plaintiffs demonstrate only "reasonable compliance" with the SOI, though the phrase appears not to have been defined at the time.

reasonably compliant.

*Id.* Ex. 24, 25.

On October 7, 2013, the Commission went into a closed session to review communications from the City Attorney. (Mot. Ex. A Tab 43). Ahead of that meeting, architect Dziurman sent a confidential letter to the Commission stating that he did not believe architect Francis was being hard enough on Plaintiffs, that a person either complies with the SOI standards or they do not, and that Plaintiffs were aware they were required to comply with those standards at the outset of the project. *Id.* Tab 44. In a letter dated October 14, 2013, the City Attorney authorized some work to be done on the Property to prepare it for winter, but noted that a certificate of occupancy could not be issued "unless and until all matters are resolved, including the need for an amended or alternate approved site plan, landscaping plan and any other outstanding administrative matters." *Id.* Tab. 45.

Plaintiffs' counsel sent the City Attorney an email on October 14, 2013, outlining what she believed was needed in order for an "up/down vote" on the project. *Id.* Tab 46. This list included: the last site plan "with the remedies to Ed Francis's concerns"[12]; "the cost/parking value calculation letters;" the "bond for the wall at a refined price and term;" and a letter "rebutting Ed Francis line by line and supporting evidence from other professionals." *Id.* The City Attorney responded that he could not tell counsel what she should or should not present and that it "is up to you, Dr. Leonor and Sarah as to what you [sic] and how you want to present." *Id.* He did note that the bond always had to be $60,000, and that the list failed to include anything about the "tree issues . . ., the maintenance agreement for the wall/parking lot, any discussion on

---

[12] This portion of Plaintiffs' attorney's e-mail seems to corroborate their allegation that Defendants had not provided them with Francis' second report which found "reasonable compliance" with the SOI.

the southerly adjacent property, the parking fund, etc.," noting that these items had been "discussed on numerous occasions." *Id.* He also noted that packets must be submitted by October 24 for inclusion in the November Commission meeting. *Id.*

According to Plaintiffs' architect, Stuhlreyer, the Commission sought a special meeting with Plaintiffs on October 23, 2013. (Plf. Resp. Ex. 3 ¶29.) At that meeting, Stuhlreyer asked what changes were left to be made and was allegedly informed by Commissioner Kingsepp that, "It's beyond that now." *Id.* Stuhlreyer also avers that the Defendants "refused to lift the stop work order unless the plaintiffs agreed to make a 'charitable contribution' of at least $40,000 to the City for a yet to be codified historic district." *Id.* ¶31. Finally, Stuhlreyer avers that "[w]hen questioned about the propriety of the defendants' 'pay-to-play' requirement, one City representative told us that if the plaintiffs did not like it or did not want to make the required contribution, then the only way to break the gridlock was to file a lawsuit." *Id.* ¶32.

Defendants do not deny that a suggestion was made that Plaintiffs make a significant contribution to a historic preservation fund, but they deny that the suggestion was an illicit "pay-to-play" demand. (Def. Reply to Mot. for Prelim. Inj. [53] Ex. L ¶¶13-14, 19).[13] Rather, they characterize the suggestion of a contribution as a way for "Plaintiffs to comply with their historical preservation commitment which formed the basis of the parking fee waiver granted in February, 2012," and claim that it was made in response to a statement by Plaintiffs that Dr. Leonor would not be willing to pay even a prorated parking fee as a remedy for the alleged preservation failures. *Id.* ¶14.

On November 15, 2013, City Manager Vettraino sent a letter to the Commission noting that on October 7 the Commission had requested that Plaintiffs submit a "full and complete

---

[13] They also dispute the date on which this meeting was held.

packet of information for the Planning Commission's consideration" "which would include all outstanding issues," but that they had not done so prior to the October 21 or November 4, 2013 scheduled meetings.  (Mot. Ex. A Tab 50).  Vettraino noted that Plaintiffs did, on or about November 14, 2013, submit a packet containing four letters: three from their attorney discussing what would be presented at a November 18 Planning Commission meeting, the bond requirement, and the easement issue; and one from their architect.  *Id.*  He noted that Plaintiffs also would provide additional information during the November 18 meeting.  *Id.*

At the November 18, 2013 meeting, Plaintiffs' architect made a presentation that included alternative parking calculations, tree fund payment amount, an agreement regarding the parking lot wall, the landscaping easement, and the maintenance agreement requested by the Commission at the August 2013 meeting.  *Id.* Tab 51.  The Commission noted that this was a "late addition" to the agenda, and, approved the following motion: "to table until the December 4th meeting in order for [Plaintiffs] to present a complete package to the Commission consisting of: the project as it was originally approved and the revised site plan currently submitted for approval, all the memoranda, with any additional documentation the applicant would like to include to support its case, including the presentation given tonight."  *Id.*

On December 4, 2013, City Manager Vettraino sent the Commission a letter that included Plaintiffs' submitted packet, noting that the packet "is not labeled" and did not include the "'new' site plan that they have requested be approved" but that, on December 4, Plaintiffs added that site plan to the binder as an attachment.  *Id.* Tab 54.  He noted that the packet did include the original site plan, the building plans as submitted, and the PowerPoint presentation from the November 18, 2013 meeting.  *Id.*  At the Commission meeting that day, it was noted that the receipt of the packet had been after the Commission's packets had gone out in preparation for the

meeting, and it was noted that the packets "had no tables, summaries, or rationales for inclusion" and thus "receipt did not conform to the motion from the 11/18/13 Special Meeting" but that the documents would be received anyway. *Id.* Tab 55.

At a Commission meeting on January 6, 2014, after receiving information from Plaintiffs' architect, the Commission moved to create a subcommittee to "meet with the applicant . . . to discuss what the expectations are of the Planning Commission, what remains to be done and to secure a written stipulation between the parties for settlement purposes in order to address all outstanding issues to settle the matter." *Id.* Tab 56.

According to an affidavit of the City's Senior Planner, Vidya Krishnan, at no point during the process did Plaintiffs apply for or seek formal amended site plan or special project approval when changes to the original site plan were determined to be necessary. Instead, they merely followed a process that "has been repeated 'tweaking' of the plans." Def. Mot. Ex. E ¶6. Krishnan sets forth, in her affidavit, a comparison between the originally approved site plan, and what she apparently has observed as the "as-built" structure, noting a number of differences between the two that she concludes reflect Plaintiffs' failure to obtain approval for the changes through the proper procedures. *Id.* ¶¶7-8.

### 2.    *Applicable Zoning Ordinances and Procedures*

The RZO sets forth the procedures to be followed regarding the approval of new development. (Mot. Ex. H). Section 2701 lists the information required for original site plan approval and for special project approval. *Id.* It does not state what is required for an application for amended site plan approval or amended special project approval. *Id.* Section 2703(a) states:

> Within 45 days after submittal of the site plan to the city by the applicant, the planning commission shall either approve, disapprove, or request

20

> modification to the site plan.  A resubmittal by the applicant of a modified site plan shall be acted upon by the commission within 45 days after receipt of the modified site plan.

*Id.*  Subsection (e) of this section states:

> Failure to comply with and/or deviate in any material way from an approved site plan shall constitute a violation of the zoning ordinance . . . For purposes of this section, a "material" deviation shall include, but is not limited to, a deviation from specific requirements, conditions and/or limitations of the city ordinances, the planning commission, or building codes, such as height, setbacks, parking, safety, screening, buffering, noise, lighting and square footage requirements.  A material deviation shall also include a change in color of the substitution of lesser quality of exterior materials from that which was presented for approval.

*Id.*  Section 2706 requires that, after approval of the site plan, "the applicant shall construct the site plan improvements in complete conformity with the approved plan.  Failure to do so is a violation of this article and subject to sanctions."  *Id.*  However, this section further states that "[a]ny minor variations or changes to the site plan, as defined in section 2700.2(a) may be approved by the city manager . . . and shall be reported to the planning commission after issuance of the certificate of occupancy."  The Court was unable to locate a section 2700.2(a) in the RZO.  The most analogous provision seems to be 2700(c)(1), which provides that the City Manager has the authority to approve a site plan without submission to the planning commission in certain limited circumstances, including:

> f.    Minor structural alterations to building intended to bring the building into compliance with the Americans with Disabilities Act requirements.
> …
> h.    Minor façade changes, which shall include the following:
> > 1.    Repair of existing exterior building material with similar materials only;
> > 2.    Replacement or repairs of existing doors and windows;
> …
> > 5.    Restoration of original building architectural features (as supported by historical data)[.]

21

*Id.*[14]

The City of Rochester has also published a "Site Plan Procedure Guide" to assist applicants in navigating the RZO.  Def. Mot. Ex. I.  It states that in pertinent part, that site plans must include 18 copies of the blueprint, completed application, all correspondence, color photos and all other written documents, and a check for the site plan submittal fee.  *Id.*  Plan submittals on new items must be received by the City four weeks before the next planned meeting, and three weeks on "previously considered items."  *Id.*  Failure to submit in time will result in the item being placed on the agenda for the subsequent meeting.  *Id.*  Failure for the applicant to be present at the meeting "may result in tabling consideration of the site plan or denial of the site plan."  *Id.*  The guide also provides a fee schedule, including $350.00 for a request for site plan approval and half of the initial fee for "resubmission of site plan."  *Id.*  Until these fees are paid in full, the guide states that "no action shall be taken on any application or appeal."  *Id.*  The guide further states that an applicant's inactivity for ninety (90) days or longer in the process "shall be deemed an abandonment of the application requiring the submission of a new application and repayment of the above fees."  *Id.*

### 3.    *Procedural Background*

On January 29, 2014, Plaintiffs filed suit against Defendants in Oakland County Circuit Court, seeking a writ of mandamus and injunctive relief, and alleging claims of "Superintending Control," "Taking/Inverse Condemnation,"[15] violations of federal procedural and substantive due

---

[14] The RZO's reference to 2700.2 seems possibly to be a holdover from a previous version of the Code, as in the above-cited section it further states "The city manager . . . shall also have the authority to refer any site plan eligible for administrative review under section 2700.2, hereof to the planning commission . . ."  § 2700(c)(4).

[15] Plaintiffs' "Taking/Inverse Condemnation" claim does not specify whether it is brought under a federal or state constitutional provision.  (Cplt. at ¶70; Am. Cplt. at ¶116).  Rather, it simply

process and equal protection, breach of contract, promissory/equitable estoppel, and violation of their rights under 42 U.S.C. § 1983. [1]. Defendants removed the action to this Court alleging federal question jurisdiction. [1]. Importantly, they then took a series of affirmative steps to litigate in this Court, including filing an answer [2], filing a counter-complaint against Plaintiffs asserting claims for nuisance, declaratory judgment, and a temporary and permanent injunction [3], filing (along with Plaintiffs) a joint discovery plan [16], and later, filing a motion for preliminary injunction [22]. Plaintiffs amended their complaint as of right on March 11, 2014, and Defendants answered the same. [11, 18].

On April 22, 2014, Defendants filed the instant motion to dismiss Plaintiffs' amended complaint. [30]. Also on that date, Defendants filed a motion for a protective order: (1) preventing Plaintiffs from deposing any of the members of the Planning Commission, Building Department or City Council regarding the matters at issue in the preliminary injunction motions prior to the hearing on those motions; and (2) preventing Plaintiffs from questioning those individuals at the motion hearing. [31]. On May 9, 2014, this Court denied the motion for protective order. [42]. Defendants then filed an emergency motion to stay that ruling, which this Court granted pending the outcome of the instant motion to dismiss. [51, 63]. On May 22, 2014,

---

alleges that the Defendants' "stop work order and its refusal to lift the stop work order and its continuing failure and refusal to approve or deny plaintiffs' application for approval of its revised site plan has deprived plaintiffs of any and all economically beneficial use of their property." *Id.* Ultimately, any ambiguity is immaterial to the issues before the Court because the Sixth Circuit has held that "[t]he substantive requirements of the Michigan Takings Clause are indistinguishable from those that the Supreme Court has held are required by the Fifth Amendment." *Anderson v. Charter Twp. of Ypsilanti*, 266 F.3d 487, 494 (6th Cir. 2001) (citing *Adams Outdoor Adver. v. City of East Lansing*, 463 Mich. 17, 614 N.W.2d 634, 638 (2000)). *Cf.* Mich. Const. art. X, § 2 ("Private property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law.") with U.S. Const. amend. V (providing that private property shall not "be taken for public use, without just compensation."). At any rate, Plaintiffs do not challenge Defendants' characterization of their takings claim as being brought under the United States Constitution. [55].

Defendants filed objections to the denial of their motion for protective order, which are pending before the District Court. [54]. On June 23, 2014, this Court held a hearing on the instant motion, where both parties presented argument.

### B.   Standard of Review

Defendants move to dismiss principally under Fed. R. Civ. P. 12(b)(1) for lack of ripeness/subject matter jurisdiction, but also, in part, under 12(b)(6)[16] for failure to state a claim.

#### 1.   Rule 12(b)(1)

When subject matter jurisdiction is challenged under Rule 12(b)(1), it is the plaintiff's burden to show that the court has jurisdiction. *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) (citing *Rogers v. Stratton Industries, Inc.*, 798 F.2d 913, 915 (6th Cir. 1986)). If the motion attacks the claim of jurisdiction on its face, the plaintiff's factual allegations must be considered as true; if the motion attacks the factual basis for jurisdiction, the court must weigh the evidence. *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004) (citing *RMI Titanium Co. v. Westinghouse Elec. Corp.,* 78 F.3d 1125, 1133–35 (6th Cir.1996); *United States v. Ritchie,* 15 F.3d 592, 598 (6th Cir.1994); *Ohio Nat'l Life Ins. Co. v. United States,* 922 F.2d 320, 325 (6th Cir.1990)).

The jurisdictional challenge before the Court here is largely a factual one, and thus the Court may go beyond the pleadings to weigh the evidence in determining whether subject matter

---

[16] While Defendants move to dismiss many of Plaintiffs' claims under Rule 12(b)(6), the fact that they first answered Plaintiffs' amended complaint technically prevents them from moving under this Rule. *See* Fed. R. Civ. P. 12(b). Courts generally consider such a motion as if it had been brought as a motion for judgment on the pleadings under Rule 12(c). *Satkowiak v. Bay Cnty. Sheriff's Dep't*, 47 Fed. Appx. 376, 377 n. 1 (6th Cir.2002); *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436, n. 1 (6th Cir.1988) (construing post-answer Rule 12(b)(6) motion as a Rule 12(c) motion); *Wagner v. Higgins*, 754 F.2d 186, 188 (6th Cir.1985) (holding that "where the substance of the motion is plain," it is proper to treat a motion styled as one under Rule 12(b)(6) as if it were brought under Rule 12(c)). This Court will do the same here.

jurisdiction is appropriate.  When weighing the evidence during a factual challenge to subject matter jurisdiction, the court is "free to…satisfy itself as to the existence of its power to hear the case."  *U.S. v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994) (citing *Ohio Nat'l Life Ins. Co. v. U.S.*, 922 F.2d 320, 325 (6th Cir. 1990)).  The Court must address the question of subject matter jurisdiction before making any decision on the merits.  *Ogle v. Church of God*, 153 Fed.Appx. 371, 374 (6th Cir. 2005) (citing *Moir v. Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) (noting that a 12(b)(1) motion must be decided before any consideration of a motion on the merits can occur)).[17]

### 2.    Rule 12(c)

A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is governed by the same standards applicable to a motion to dismiss pursuant to Rule 12(b)(6).  *See Lindsay v. Yates*, 498 F.3d 434, 437 n.5 (6th Cir. 2007) ("[T]he legal standards for adjudicating Rule 12(b)(6) and Rule 12(c) motions are the same[.]").  Under Fed. R. Civ. P. 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (*quoting Bell Atl. Corp. v.*

---

[17] While courts are advised to limit their making of factual findings on the issue of jurisdiction, such as where the jurisdictional question and the merits of the case are inextricably intertwined, *see Fireman's Fund Ins. Co. v. Railway Express Agency, Inc.*, 253 F.2d 780, 784 (6th Cir. 1958), neither party argues that this is such a case.  Indeed, Defendants have specifically asked this Court to consider the jurisdictional question ahead of a determination on the merits.  Furthermore, at least one circuit has specifically concluded that "the issue of ripeness has nothing to do with the merits of claims challenging land use regulations, and, indeed, a district court errs if it submits the issue to the jury."  *St. Clair v. City of Chico*, 880 F.2d 199, 202 (9th Cir. 1989).  Thus, to the extent this Report and Recommendations makes factual findings or draws inferences in connection with its jurisdictional analysis, it should be clear that they are based on the limited record presently before the Court, and that ultimately the appropriate trier of fact will resolve any factual disputes as to the merits after the record has been fully developed.

*Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (*citing Twombly*, 550 U.S. at 556).  The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]."  *Twombly*, 550 U.S. at 556.  Put another way, the complaint's allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief."  *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 550 U.S. at 555-56).

In deciding whether a plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true.  *Id.*; *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  That tenet, however, "is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," to prevent a complaint from being dismissed on grounds that it fails to sufficiently comport with basic pleading requirements.  *Iqbal*, 129 S.Ct. at 1949.  *See also*, *Twombly*, 550 U.S. at 555; *Howard v. City of Girard, Ohio*, 346 Fed. Appx. 49, 51 (6th Cir. 2009).  Furthermore, a court is not required to "create a claim which [a plaintiff] has not spelled out in his pleading."  *Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir. 1975).  Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 129 S.Ct. at 1949.

### C.     Analysis

#### 1.     Dismissal under Rule 12(b)(1)

Defendants first move to dismiss Plaintiffs' Takings claims (and the other federal claims

ancillary thereto)[18] for lack of subject matter jurisdiction on the basis that they are not yet ripe

for adjudication.

Ripeness is generally a question of jurisdiction in the first instance.  As the Sixth Circuit

has explained, the ripeness doctrine "is more than a mere procedural question; it is determinative

of jurisdiction.  If a claim is unripe, federal courts lack subject matter jurisdiction and the

complaint must be dismissed."  *Dealer Computer Servs. v. Dub Herring Ford*, 547 F.3d 558, 560

(6th Cir. 2008) (quoting *River City Capital, L.P. v. Bd. of County Comm'rs*, 491 F.3d 301, 309

(6th Cir. 2007)).  Ripeness "draw[s] both from Article III limitations on judicial power and from

prudential reasons for refusing to exercise jurisdiction."  *Id.* at 560-61 (quoting *Nat'l Park Hosp.

Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)).  The ripeness doctrine acknowledges the

problem inherent in adjudicating a dispute "anchored in future events that may not occur as

anticipated, or at all."  *National Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 284 (6th Cir.

1997).

A Takings claim's ripeness is determined under a two-pronged test, as set out by the

Supreme Court in *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*,

473 U.S. 172 (1985).  First, the plaintiff must show that a final decision has been reached by the

appropriate regulatory body, as "a claim that the application of government regulations effects a

taking of a property interest is not ripe until the government entity charged with implementing

---

[18] While Defendants argue that "Plaintiffs' federal and state claims are not ripe," Mot. at 30, they
do not specifically apply a ripeness analysis to Plaintiffs' breach of contract or promissory
estoppel claims.

the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Id.* at 186.  Second, the plaintiff must show that she has either exhausted her state remedies and been unfairly compensated, or show that state remedies are inadequate to justly compensate her for any proven taking of property.  "If a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until she has used the procedure and been denied just compensation."  *Id.* at 195.  Thus, analyzing a Takings claim involves consideration of these "two distinct concepts." *Seguin v. City of Sterling Heights*, 968 F.2d 584, 587 (6th Cir. 1992).

Importantly, the Supreme Court has held that questions of ripeness as they relate to exercising jurisdiction over a Takings claim are not jurisdictional in the strict sense of the term, but are primarily prudential in nature.  *See, e.g., Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 733-34 (1997) (explaining that "There are two independent ***prudential*** hurdles to a regulatory takings claim brought against a state entity in federal court," and referencing *Williamson County's* "prudential ripeness principles") (emphasis added).  Recently, in *Horne v. Dept. of Agriculture*, 133 S.Ct. 2053, 2062 (2013) (internal citations omitted), the Court explained:

> …the *Williamson County* plaintiff's takings claim was not yet ripe because the plaintiff had not sought "compensation through the procedures the State ha[d] provided for doing so."  We explained that "[i]f the government has provided an adequate process for obtaining compensation, and if resort to that process yields just compensation, then the property owner has no claim against the Government for a taking."  Stated differently, a Fifth Amendment claim is premature until it is clear that the Government has both taken property and denied just compensation.  Although we often refer to this consideration as "prudential 'ripeness,'" we have recognized that it is not, strictly speaking, jurisdictional.[19]

---

[19]  In a footnote appearing here in the Supreme Court's opinion, it wrote, "A 'Case' or 'Controversy' exists once the government has taken private property without paying for it. Accordingly, whether an alternative remedy exists does not affect the jurisdiction of the federal

*See also Stop the Beach Renourishment, Inc. v. Florida Dept. of Envtl. Prot.*, 560 U.S. 702, 729 (2010) (characterizing the test for Takings claim ripeness as one of "prudential ripeness" that is "not, strictly speaking, jurisdictional.").

As some scholars have recently noted, this is a significant distinction because it means that, unlike other claims found to be "unripe," the Supreme Court acknowledges that federal courts possess original Article III jurisdiction over Takings claims premised on federal law and determine, on prudential grounds, whether they ought to exercise that jurisdiction.  *See* J. David Breemer, *The Rebirth of Federal Takings Review? The Courts' "Prudential" Answer to Williamson County's Flawed State Litigation Ripeness Requirement*, 30 TOURO L. REV. 319 (2014) (citing *City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 163-64 (1997) (finding original jurisdiction over Takings claim that was removed by the defendants from state to federal court because "The propriety of removal … depends on whether the case originally could have been filed in federal court.")) and Michael B. Kent, Jr., *Fourth Circuit Survey: Comment: Weakening the "Ripeness Trap" for Federal Takings Claims: Sansotta v. Town of Nags Head and Town of Nags Head v. Toloczko*, 65 S.C. L. Rev. 935 (2014) ("If a takings claim presents a federal question for purposes of removal, it equally does so for purposes of initiating a civil action…the ripeness at issue in the state litigation requirement is not rooted in any limitations imposed by Article III.") (citing *inter alia*, *City of Chicago*, 522 U.S. at 163-64).

Against this backdrop, the Court turns to its consideration of *Williamson County*'s two prudential ripeness prongs.

        *a.*     *Final Decision*

A regulatory body's "final decision" informs the analysis of whether a regulation (or

court."  *Id.* at n 6.

governmental action) has deprived a landowner of "all economically beneficial use" of the property, or the landowner's "reasonable investment-backed expectations" have been defeated to the extent that a taking has occurred. *Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2001) (citing, *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992); *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)). "These matters cannot be resolved in definitive terms until a court knows 'the extent of permitted development' on the land in question." *Id.* (citing *MacDonald, Sommer & Frates v. Yolo Cnty.*, 477 U.S. 340, 351 (1986)).

Defendants argue that Plaintiffs do not satisfy this prong because they have not received a final decision from the Commission from which they could seek relief. They fault Plaintiffs for failing to heed the Commission's requests to submit a complete package for it to review. In addition, Defendants argue that Plaintiffs' construction (which they claim materially fails to comport with the approved site plan and the SOI standards), as well as Plaintiffs' removal of a tree that was specifically required for retention, constitute violations of the RZO such that Plaintiffs cannot be found to have received a final decision on their project as-is. Finally, Defendants argue that Plaintiffs were required to resubmit a new application for both site plan and special project approval, with all the required documentation of an initial application, as well as a new fee, in order for their amended site plan to receive a decision. Plaintiffs' alleged failure to do so, argue Defendants, renders their Takings claim unripe.

Plaintiffs argue that they have submitted a complete package for review by the Commission and that the Commission repeatedly failed to act. Plaintiffs point to myriad documents submitted to the Commission in response to each of the Commission's requests. They also point to the fact that the Commission never requested a new application or an additional fee to consider Plaintiffs' amended site plan. Indeed, on December 4, 2013, the

Commission specifically agreed "to receive the documentation provided by [Plaintiffs]," but still failed to take a vote on the project. (Mot. Ex. A Tab 55).

With regard to their alleged failure to comply with the site plan, Plaintiffs argue that they have complied with the Commission's demands related to the removal of the tree, and that Francis' second report (which they allegedly were never provided), *supra* at 16, declared that they were in reasonable compliance with the SOI standards. Plaintiffs allege that despite all of this, the Commission's next step was simply to refer the matter to a "subcommittee" that did not even exist at the time.

Plaintiffs argue that any attempt they have made to comply with the Commission's requests and their attempts to obtain a final up or down vote on their site plan have been met with continuous shifting of requirements, demands for extortionate payments for an uncodified historic district (Resp. Ex. 2, ¶ 31), or outright refusal to make a decision. They argue that they should not be required to obtain an actual final decision from the City before litigating, as the evidence and history shows that any further attempts to obtain that decision would be futile.

Plaintiffs correctly argue that due to its prudential nature, *Williamson's* finality prong is not mechanically applied, and a landowner may be excused from obtaining an actual final decision in certain circumstances, including where any attempt to obtain that decision would be futile, or where the landowner would be subjected to repetitive and unfair land-use procedures in order to obtain that decision. *See Sherman v. Town of Chester*, 752 F.3d 554, 561-62 (2d Cir. 2014) (*citing Palazzolo v. Rhode Island*, 533 U.S. 606, 621 (2001)); *MacDonald,* 477 U.S. at 350 n.7 ("A property owner is of course not required to resort to piecemeal litigation or otherwise unfair procedures in order to obtain this determination."); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1012 n.3 (1992) (stating that an application for a variance from a zoning

board is not required when it would be "pointless"); *Bigelow v. Michigan Dep't of Nat. Resources*, 970 F.2d 154, 158 (6th Cir. 1992) (quoting *Bannum v. City of Louisville*, 958 F.2d 1354, 1362 (6th Cir. 1992) (finality means "that the actions of the city were such that further administrative action by [the plaintiff] would not be productive" for example when the "proceedings have reached some sort of impasse and the position of the parties has been defined."). While these two exceptions (futility and unfair procedures) are distinct concepts, they necessarily require the same analysis, since the futility of a landowner's attempts to obtain a final decision may ultimately be the result of unfair procedures, and unfair or repetitive procedures will likely result in a landowner's inability to obtain a decision, rendering his attempts futile.

For example, in *Sherman*, the Second Circuit found the plaintiff landowner could overcome the finality requirement even though the town in question had not made a final decision on his application. 752 F.3d at 562-63. The landowner had purchased a $2.7 million dollar parcel of land, and spent upwards of $5.5 million additional dollars attempting to build on it, as a result of what the court described as the "Town's ever-changing labyrinth of red tape," which included constant changes in zoning ordinances, development moratoriums (some of which *de facto* applied only to the plaintiff's parcel), additional fees, further paperwork filings, and unjustified refusals to put the plan on the agenda. *Id.* at 557-59. The district court dismissed the case, concluding that despite the fact that the plaintiff was required to "jump[] through many hoops—more, perhaps, than sound policy should require," he did not establish an inference that at the end of the process there would be a "brick wall" preventing him from obtaining a final decision. *Id.* at 562-63. The Second Circuit reversed, finding that "[t]he Town will likely never put up a brick wall in between [the plaintiff] and the finish line. Rather the finish line will

always be moved just one step away until [the plaintiff] collapses." *Id.* at 563.

A similar conclusion was reached by the Ninth Circuit in *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496 (9th Cir. 1990). There, landowners who were seeking to develop their property with 344 residential units were repeatedly rebuffed and invited to resubmit plans with increasingly smaller and small numbers of units, only to be rebuffed again, and the process repeated. *Id.* at 1506. Each time the landowners submitted a plan that was in compliance with the planning commission's suggestions, the commission rejected the plan, and again requested a new plan with even fewer units. *Id.* The Ninth Circuit, like the Second in *Sherman*, ruled that the landowners did not need to show a final decision had actually been made in order to overcome *Williamson's* finality prong, reasoning that "[r]equiring [the landowners] to persist with this protracted application process to meet the final decision requirement would implicate the concerns about disjointed, repetitive, and unfair procedures expressed in *MacDonald . . .*" *Id.* (internal citations omitted).

Under the facts discussed above, the Court concludes that Plaintiffs here need not show that they received an actual final decision on their application in order to proceed with their Takings claim in this Court. Plaintiffs' futility argument is supported by substantial evidence. The relevant documents show that Defendants' "primary concern" after construction began was with the project's "reasonable compliance" with the SOI standards. (Mot. Ex. A Tab 22).[20] Defendants specifically agreed that "the project [must] demonstrate reasonable compliance with the [SOI] standards, **and in case of a disagreement between the two parties, an outside expert will be selected by City Administration and paid for by the applicant.**" (Mot. Ex. A Tab 16)

---

[20] Indeed, it was only after issuance of the Francis report, finding non-compliance with those standards, that Defendants issued a stop-work order on the project and demanded that Plaintiffs provide solutions.

(emphasis added). Similarly, the March 26, 2013 Planning Committee meeting minutes state, "the process in place in case of dispute [as to compliance with the SOI] was a third party arbiter as represented by Mr. Francis." *Id.* Tab 29 at 2. The only reasonable interpretation of this language is that if the parties could not agree as to whether the project "reasonably complied" with the SOI standards – and they obviously could not agree on that issue – the Defendants would rely on the determination of the "outside expert" selected by the City – Mr. Francis. (Def. Mot. Ex. A, Tab 16). As discussed above, *supra* at 16, on October 1, 2013, Francis issued his report concluding that the project did "reasonably comply" with the SOI. (Resp. Ex. 23 at 7). Thus, as of that date, the issue of "reasonable compliance" with the SOI should have been resolved in Plaintiffs' favor.[21]

The Court also notes Plaintiff's allegation, which Defendants do not rebut, that they kept Francis' conclusion from Plaintiffs, leading them to believe that the SOI compliance issue was still in play. Defendants, with this undisclosed leverage, continued to pursue an amended parking fee arrangement. Defendants also suggested Plaintiffs could alternatively contribute to a historical preservation fund. Whether or not such a contribution is characterized as a "pay to play" scheme, it seems that any request for Plaintiffs to make the contribution for either parking or the preservation fund was premised, at least in part, upon the notion that they failed to reasonably comply with the SOI standards, when, in fact, the agreed-upon "arbiter" concluded

---

[21] The Court rejects Defendants' argument that the final decision on the "reasonable compliance" issue was only the Planning Commission's to make. They chose to make Francis an "arbiter," not an "advisor," and it was under those auspices that they required Plaintiffs to pay for Francis' services. (Mot. Ex. A Tab 16 at 4 ("paid for by the applicant")). Influencing Francis to edit his report to imply a different purpose for his work does not undo this reality. *See supra* at 16. Also cutting against Defendants' argument is that they understood the "reasonable compliance" standard to be vague, yet never defined it, or took a vote as to whether Plaintiffs satisfied the standard. This plays directly into the Plaintiffs' futility argument; the approving body cannot implement a vague standard, refuse to define it, fail to vote on an applicant's compliance with the standard, and then fault the applicant for not receiving a final decision on its compliance.

that they had achieved reasonable compliance.

The Court also rejects the argument that Plaintiffs' removal of the Elm tree was an alternate legitimate reason for the Commission's refusal to subject the amended site plan to an up or down vote. The Commission approved Plaintiffs' amended landscaping plan reflecting the removal of that tree and accounting for its replacement. And, contrary to City Attorney Kragt's averments, Defendants' own Commission minutes reflect Plaintiffs' continued commitment to contribute to the tree fund as demanded by the Commission as a remedy to the tree's removal, including at the January 4, 2014 meeting where Defendants ultimately relegated the matter to a non-existing "subcommittee" rather than take a vote on it.

The Commission also imposed additional, and arguably unreasonable and unnecessary hurdles to Plaintiffs' attempts to secure an up or down vote on their amended site plan. The Commission claimed at several points that Plaintiffs had not submitted all of the necessary documents, but at almost every meeting either failed to make specific demands of Plaintiffs or failed to specifically articulate what documents were missing. For example, the July 27, 2013 City Planner letter noted that the modifications to be considered were the 16 outlined in the April 25, 2013 letter, an updated landscape plan (that the Planner acknowledged had already been approved), confirmation that the porch railing was made of wrought iron, and details submitted about the flood lights. She further noted that if there are any requests for other modifications "a record should be made of those requests." (Mot. Ex. A. Tab 38). At the August 5, 2013 Commission meeting, in which the Planner's letter was received, the Commission did not outline what was needed for approval of the amended site plan, but relegated that discussion to the City Attorney and Plaintiffs' attorney, noting only that it would include "definition of terms under which the stop work order might be removed" and required a waiver by Plaintiffs of "certain

rights and claims against the City."[22] *Id.* Tab 39.

On October 14, 2013, Plaintiffs' attorney sent a letter to the City Attorney, attempting to confirm what was needed to be presented to obtain a vote on the amended site plan.  The City Attorney responded cryptically, stating only that he could not tell counsel what to present and that it "is up to you, Dr. Leonor and Sarah as to what you [sic] and how you want to present."  *Id.* Tab 46.  He did, however, mention issues such as the bond, tree issues, a maintenance agreement for the parking lot and wall, a discussion on the southerly adjacent property, and the parking fund.  *Id.*

At the November 18, 2013 meeting, Plaintiffs' architect made a presentation that included an alternative parking calculation, tree fund payment amount, an agreement regarding the parking lot wall, the landscaping easement and a maintenance agreement, as requested by the Commission.  Noting only that this was a late addition, the Commission ultimately tabled its review, and invited Plaintiffs to submit "a complete package" which the Commission said needed to include "the project as it was originally approved and the revised site plan currently submitted for approval, all the memoranda, with any additional documentation the applicant would like to include to support its case, including the presentation given tonight."  *Id.* Tab 51. As noted by City Manager Vettraino's December 4, 2013 letter, the documents were received, including the old site plan, the building plans as submitted, and the architect's presentation, which had included the tree fund contribution, the alternative parking calculation and the other items noted above that were presented at the November 18 meeting.  The Commission met on that date, and agreed "to receive the documentation provided by [Plaintiffs] …" despite noting

---

[22] Nowhere in the Code cited by Defendants does it indicate that a site plan approval can be conditioned on the applicant's waiver of potential claims it may have against the City, and it seems at least questionable as to whether imposing such a condition is appropriate.

that it was late and "had no tabs, summaries, or rationales for inclusion".  *Id.* Tab 55.[23]   At

neither that meeting, nor the final January 4, 2014 meeting, did the Commission state that the

packets received failed to include the documents requested at the previous Commission meeting.

Nor, contrary to Defendants' argument, did the Commission ever state that Plaintiffs were

deficient in failing to file a brand new application and a new application fee.

Again, instead of making a decision on the amended site plan, the Commission punted,

relegating the matter to a "subcommittee" that did not even exist at the time, and seemingly

conditioning any approval on Plaintiffs' agreement to waive any claims it may have had against

Defendants.  (Mot. Ex. A Tab 56) (noting that the to-be-formed subcommittee would work with

Plaintiffs to "discuss what the expectations are of the Planning Commission, what remains to be

done and to secure a written stipulation between the parties for settlement purposes in order to

address all outstanding issues to settle the matter.").  *See supra*, fn. 22.

Therefore, despite Plaintiffs' repeated attempts to comport with the Commission's

moving-target criteria for what information was needed, even when Plaintiffs ultimately tendered

the Commission what appears to be all of the necessary and requested documents, it still failed to

render a final decision on the project.  That this process had now been going on for two years

only highlights the conclusion that there appears nothing Plaintiffs could reasonably have done

to obtain a final decision on the project.

For all of the reasons discussed above, including those concerning the prudential nature

of the *Williamson County* prongs, the Court finds that although Plaintiffs never obtained a final

decision from the City, that is not a basis for this Court to conclude it lacks subject matter

---

[23] Defendants fail to cite any ordinance or provision in the guide which they supply to applicants regarding the site plan approval process that requires that packets include tabs, summaries or rationales for inclusion.

jurisdiction over Plaintiffs' Takings claim.[24]

### b.   Exhaustion of State Remedies

The Court now turns to whether Plaintiffs have satisfied, or can overcome, *Williamson County's* second prong – that they exhaust their state remedies before initiating litigation.  In a Takings claim, if the "State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation."  *Williamson Cnty.*, 473 U.S. at 195; *see also Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1215 (6th Cir. 1992) ("[U]ntil state remedies have been utilized….the federal court cannot determine whether a taking has occurred, whether compensation is due, or, if it has been afforded, whether it is just.").  However, just as with the finality prong, the exhaustion prong is prudential in nature, and adherence to it should not be mechanically applied.  *Supra* at 27-29.

---

[24] In their reply brief, Defendants argue that Plaintiffs cannot now argue futility where they have effectively abandoned their application.  In support of their argument, Defendants cite to two emails.  In the first e-mail, from Dr. Leonor to his counsel on January 2, 2014, he states that he had been told by City Manager Vettraino that the Commission would render an up or down vote on the project at the next meeting.  [38 Ex. P].  The second, dated January 15, 2014, from Dr. Leonor to his architect, was in response to a request from a Commission member for a list describing all the changes made and the reasons for the changes, while acknowledging that much of the information was already in the binder provided.  Plaintiffs' architect had responded, reiterating that everything needed was in the binder, and copied Dr. Leonor on the email.  Dr. Leonor then instructed, "do not give them anything else."  *Id.* Ex. Q.  In addition to the fact that the Court need not consider this argument since it was first raised in Defendant's reply brief, *see Randy Disselkoen Props., LLC v. Charter Twp. of Cascade*, No. 06-141, 2008 U.S. Dist. LEXIS 1504, *40-41 (W.D. Mich. Jan. 9, 2008) (refusing to consider issue of finality raised for first time in reply brief) *citing NLRB v. Int'l Health Care, Inc.*, 898 F.2d 501, 506 n.5 (6th Cir. 1990)), Defendants' argument lacks substantive merit where Plaintiffs voluntarily attended the January 4, 2014 Commission meeting at which an up or down vote was to take place, only to have the matter relegated to a non-existing subcommittee.  Further, Dr. Leonor's statement directing his architect to "not give them anything else," when viewed in the context of the repeated demands for items that the Commission concedes are "already in the binder" cannot be interpreted as anything more than the legitimate frustration of a party at the continued moving of the finish line.  *See Sherman*, 752 F.3d at 563.

The State of Michigan has long provided for just compensation arising from a taking under the doctrine of inverse condemnation. *Macene v. MJW, Inc.*, 951 F.2d 700, 704 (6th Cir. 1991) (citing Michigan Const., Art. 10, § 2 (1963)). Plaintiffs here first sought state court relief by filing their complaint in Oakland County Circuit Court. Their action is presently venued in the Eastern District of Michigan only because Defendants removed it to this Court, based on the fact that Plaintiffs had pled at least some federal claims. [1 at ¶ 4 ("[Plaintiffs' federal] allegations, involving claims arising under the U.S. Constitution and laws of these United States (42 USC § 1983) are within the original jurisdiction of this United States District Court.")]. Plaintiffs argue that Defendants' removal of the action should result in a finding that their attempt to pursue state remedies was "rebuffed." (Doc. #55 at 20). More specifically, Plaintiffs argue that they:

> attempted to pursue state law remedies and were rebuffed by defendants, who themselves decided to remove the case to federal court only to argue now that the case should not have been removed. Under defendants' paradigm, there is no forum in which plaintiffs can bring their claims, and no procedure by which plaintiffs can seek redress of defendants' perpetual inaction. Plaintiffs have met their requirement to pursue state remedies, and any alleged failure to do so is completely a result of defendants' actions.

(*Id.*). Defendants argue that their removal of the action to this Court has no bearing on whether the case actually belongs here jurisdictionally, and that they were within their rights to remove the case here, and then to seek dismissal of Plaintiffs' claims on grounds of ripeness (among others).[25]

---

[25] In their reply brief, Defendants also argue that Plaintiffs failure to appeal the Commission's action to the Zoning Board of Appeals ("ZBA") further undermines their claim of ripeness. The Court first notes that Defendants raise this argument for the first time in their reply brief, and thus the argument is not properly before the Court. *Randy Disselkoen Props.,* 2008 U.S. Dist. LEXIS 1504 at *40-41. Furthermore, Defendants do not assert that the ZBA would even consider Plaintiffs' appeal, since they simultaneously claim that no final decision has been

The Court disagrees.  The Supreme Court has frequently repeated that the state litigation requirement is a prudential consideration.  *San Remo Hotel, L.P. v. City and Cty. of San Francisco*, 545 U.S. 323, 351 n.2 (2005) (Rehnquist, C.J. concurring); *Stop the Beach*, 560 U.S. at 729; *Horne*, 133 S. Ct. at 2062 (referring to the state litigation prong as "prudential ripeness" that is "not, strictly speaking, jurisdictional.") (*citing Stop the Beach*, 560 U.S. at 729). Furthermore, a number of Justices have outright stated their disdain for the requirement in its entirety, requesting a "review" of the logic behind the requirement "in an appropriate case."  *San Remo*, 545 U.S. at 341 (Rehnquist, C.J. concurring) (writing for four justices to explain their belief that state litigation requirement of *Williamson* "may have been mistaken.").

Problems with the state litigation requirement are many.  In order for a plaintiff to properly exhaust his remedies, he must first file, and follow through to completion, any state Takings or inverse condemnation claim in state court.  *San Remo*, 545 U.S. 333-334.  In order to do this and preserve his federal Takings claim, he must also bring that claim in state court.  *Id.* But if he loses in state court, any attempt to subsequently file his federal Takings claim in federal court will be barred by *res judicata*, claim preclusion and/or invocation of the Full Faith and Credit clause.  *Id.* at 340-42.  Thus, save for an unusual circumstance (*e.g.*, where an appeal from the state's highest court is heard by the U.S. Supreme Court), the notion that exhausting state remedies allows for subsequent litigation in federal court is an illusion, and the plaintiff's claim, including his federal claim, will ultimately be decided to finality in state court.  As the Seventh Circuit has explained:

> Although the *Williamson* line of cases that requires the property owner to seek compensation in the state courts speaks in terms of "exhaustion" of

---

reached from which to appeal.  *See* Def. Reply Ex. O RZO § 3001(1) (zoning board of appeals has power to "hear and decide appeals from and review any order, requirements, decision, or determination made by an administrative official or body…").

> remedies, that is a misnomer.  For if . . . the property owner goes through the entire state proceedings, and he loses, he cannot maintain a federal suit.  The failure to complain of the taking under federal as well as state law is a case of "splitting" a claim, thus barring by virtue of the doctrine of *res judicata* a subsequent suit under federal law.

*Rockstead v. City of Crystal Lake*, 486 F.3d 963, 968 (7th Cir. 2007).

Courts have found this snare particularly troubling when the defendant to the state action removes it to federal court based on the fact that the complaint contains federal claims.  In *Sansotta v. Town of Nags Head*, the Fourth Circuit recently dealt squarely with this issue.  724 F.3d 533 (4th Cir. 2013).  In that case, the property-owners filed a claim in state court alleging, among other things, federal and state Takings and inverse condemnation claims.  *Id.* at 538.  The defendant removed to federal court based on federal question jurisdiction.  *Id.* at 538-39.  At the summary judgment stage, the defendant moved to dismiss the plaintiffs' Takings claims as being unripe.  *Id.*  The district court agreed and dismissed those claims.  *Id.*

The Fourth Circuit reversed.  *Id.* at 544-48.  Acknowledging that *Williamson County* only invokes prudential considerations, the court determined that it may, in some instances, find that the rule should not apply and that the court should still have jurisdiction to hear the case.  *Id.* at 545.  The court concluded that the case before it was "such an instance" and found that by removing the state case to federal court, the defendants waived their right to argue for dismissal based on failure to exhaust state remedies.  *Id.* at 546-48.  The court noted that the litigation requirement was "grounded on the idea that 'state courts undoubtedly have more experience than federal courts do in resolving the complex factual, technical and legal questions related to zoning and land-use regulations.'"  *Id.* at 545-46 quoting *San Remo*, 545 U.S. at 347.  It also noted, however, that this preference does not mean that federal courts are incapable of dealing adequately with such matters and that a defendant "implicitly agrees with this conclusion when

he removes a case involving such a state or municipal law to federal court." *Id.* at 545.  The court further found that refusing to apply the state-litigation requirement in instances of removal "ensures that a state or its political subdivision cannot manipulate litigation to deny a plaintiff a forum for his claims," and also prevents the need to engage in unfair or piecemeal litigation that *San Remo* prohibits.  *Id.* at 545-46.

The court analogized the Supreme Court's decision in *Lapides v. Board of Regents of the University Systems of Georgia*, 535 U.S. 613 (2002), which held that a state that removes to federal court a case that contains both a Section 1983 claim and state law claims, cannot then seek to dismiss the case based on Eleventh Amendment immunity, noting that "[i]t would seem anomalous or inconsistent for a State both (1) to invoke federal jurisdiction, thereby contending that the Judicial power of the United States extends to the case at hand, and (2) to claim Eleventh Amendment immunity, thereby denying that the Judicial power of the United States extends to the case at hand." *Id.* at 546.  The Supreme Court in *Lapides* ultimately held that "removal is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter . . . in a federal forum." *Id.*  The Fourth Circuit in *Sansotta* concluded that the same logic applied to the defendants' removal of the plaintiffs' Takings claim, holding that under this analogous case law, a federal Takings "claim can come into federal court before the state has denied compensation [ ] when the state or its political subdivision chooses to remove the case to federal court," thereby invoking its jurisdiction.  *Id.* at 546-48.[26]

---

[26] In *DLX, Inc. v. Kentucky*, 381 F.3d 511, 534, n.4 (6th Cir. 2004) Judge Baldock, concurring with the majority's ruling that the state did not waive its Eleventh Amendment immunity, chided the majority for refusing to resolve the first prong of *Williamson* ripeness for lack of factual development below, noting that unlike immunity, ripeness cannot be waived.  However other courts, relying on the more recent Supreme Court case law, have found that because *Williamson*

Since *Sansotta* was decided, a number of other courts, including the Second Circuit and a Michigan state appellate court, have agreed with the conclusion that a defendant who removes a Takings claim from state court to federal court thereby waives any argument against the federal court's jurisdiction based on failure to exhaust state remedies.  *See Sherman*, 752 F.3d 554; *River North Properties, LLC v. The City and County of Denver*, No. 13-01410, 2014 U.S. Dist. LEXIS 40151 (D. Colo. Mar. 26, 2014); *Athanasiou v. Town of Westhampton*, No. 14-30029, 2014 U.S. Dist. LEXIS 95769 (D. Mass. July 14, 2014); *Zanke-Jodway v. Capital Consultants, Inc.*, No. 306206, 2014 Mich. App. LEXIS 546 (Mar. 27, 2014) (citing *Sansotta* for the conclusion that a state "waives *Williamson's* ripeness requirement when it removes the case to federal court.").

In *Sherman*, the Second Circuit, facing similar facts, adopted *Sansotta's* reasoning, and found that removal of a plaintiff's Takings claim to federal court:

> prevents [him] from pursuing both claims simultaneously, no matter what forum they are brought in.  This runs against *San Remo*, which allows plaintiffs to do just that.  In other words, the removal tactic can 'deny [ ] a plaintiff *any* forum for having his claim heard,' or at least force the plaintiff into the kind of piecemeal litigation that, under *San Remo*, cannot be required.

752 F.3d at 564.  The Second Circuit concluded that "when a defendant removes a takings claim from state to federal court, the second prong of *Williamson County* is satisfied."  *Id.*  Similarly, in *River North*, the court, in addition to adopting the analysis of *Sansotta*, explained that the application of the ripeness doctrine "turns in part on 'the hardship to the parties of withholding court consideration.'"  *Id.* at *7.  Applying the state-exhaustion requirement, the court held, would result in undue hardship to the plaintiff, in that it would have to re-file the action yet again

---

ripeness is merely a prudential consideration, prior holdings that it cannot be waived are "no longer good law."  *Rosedale Missionary Baptist Church v. New Orleans City*, 641 F.3d 86, 87-89 (5th Cir. 2011); *Stop the Beach*, 560 U.S. at 733 (finding *Williamson* argument waived in light of respondent's failure to raise it in briefing before the Court).

in state court, "submit to another round of filing fees, conform again to a different set of procedural rules, and experience further delay in resolution of its case – all because of a discretionary decision made by state actors." *Id.* at *29-30.

Here, the Court agrees with the rationale of *Sansotta*, *Sherman*, and *River North* and, acknowledging the increasingly sharp comments of the Supreme Court on the issue, finds that, at least under the circumstances presented here, Defendants have waived their right to argue that Plaintiffs' failure to exhaust state remedies acts as a bar to federal jurisdiction. Plaintiffs did everything they were asked to do under *Williamson* and *San Remo*; they brought their action first in state court; they brought their action with both federal and state Takings claims, so as to avoid the consequences of splitting the action; and they brought their ancillary claims of substantive and procedural due process and equal protection, which are premised upon largely the same facts.

The Court also finds it relevant that here Defendants went well beyond the voluntary decision to remove the action to this Court, thus invoking its jurisdiction. Thereafter, took numerous affirmative steps to litigate the dispute in this Court before filing their motion to dismiss. Rather than filing a motion to dismiss within the timeframe for filing their responsive pleading, Defendants instead filed an answer to Plaintiffs complaint. They then filed counter-claims, filed another answer to Plaintiffs' amended complaint, and filed an affirmative motion for preliminary injunction. All of these actions caused Plaintiffs to invest much time and money litigating their claims in this Court, and it is unreasonable for the Defendants to now argue that because Plaintiffs did not exhaust their state court remedies, their claims do not belong in this Court.

While the Court is mindful that one of the overriding principles of determining ripeness is

to consider the harm to the parties if the court were to exercise jurisdiction, Defendants set forth no claims of harm they would suffer if this Court, rather than the state court, were tasked with deciding matters of state law that are inextricably intertwined with issues of federal law.  Just as state courts are capable of handling issues of federal law, so too are federal courts capable of dealing with matters of state law.  *See San Remo*, 545 U.S. at 350-51 (Rehnquist C.J. concurring) (noting that state court's simple familiarity with local land use laws is not necessarily sufficient to permit it to be the sole arbiter of federal Takings claims).  Furthermore, the harm that would befall Plaintiffs if this case were dismissed, as Defendants request, is self-evident.  Plaintiffs have invested much time and money into this case since its removal, having briefed three motions brought by Defendants, including this one, and participating in hearings regarding two of them.  To now dismiss this case would no doubt cause harm to Plaintiffs as it would further delay the resolution of this matter, "all because of a discretionary decision made by state actors." *River North*, 2014 U.S. Dist. LEXIS 40151 at *29-30.

The Court acknowledges that the Sixth Circuit has not yet specifically weighed in on this issue.  Although a recent unpublished Sixth Circuit decision on the general subject of *Williamson* ripeness held, with little discussion, that the plaintiffs' failure to exhaust was a jurisdictional bar to their claims, *see Stanislaw v. Thetford Twp.*, 515 Fed. Appx. 501 (6th Cir. 2013), even more recently, the Sixth Circuit retained jurisdiction over a Takings claim where it was clear there was no taking in the first instance, specifically relying on the prudential nature of the *Williamson* factors.  *Wilkins v. Daniels*, 744 F.3d 409, 418 (2014) ("*Williamson County* ripeness is a prudential doctrine.") (citing *Suitum*, 520 U.S. at 733-34).[27]

---

[27] The Court also acknowledges that its analysis results in a different outcome than that of a similar case in this district, *Seiler v. Charter Township of Northville*, 53 F. Supp. 2d 957 (E.D. Mich. 1999), which was cited by Defendants.  Facing a similar procedural posture – a federal

For all of the foregoing reasons, the Court concludes that although Plaintiffs did not exhaust the state court review of their claims, that failure, having been caused by Defendants' removal of their action to this Court, is not a basis for this Court to conclude it lacks subject matter jurisdiction over Plaintiffs' Takings claim.  Therefore, Defendants' motion to dismiss Plaintiffs' Takings claim and their ancillary constitutional claims[28] under Rule 12(b)(1) should be denied.

### 2.     *Dismissal Under Rule 12(c)*

The Court now turns to whether Plaintiffs have sufficiently stated claims for relief under more general pleading standards.  In doing so it will limit its discussion, as required by Rule 12(c), to only the allegations contained in the operative complaint and documents that may properly be considered under that Rule.  *See supra*, fn. 1.

### a.     *Constitutional Claims - Protected Property Interest*

Defendants argue that none of Plaintiffs' constitutional claims can survive a motion to dismiss because Plaintiffs have not properly alleged a protected property interest.  Defendants

---

takings claim filed in state court that had been removed to federal court – the federal district court concluded that the "right to remove federal claims is separate and distinct from the question of whether those claims are ripe for adjudication" and held that despite the fact that the defendants removed the case to federal court, the plaintiffs' failure to exhaust state remedies meant the takings claim was not ripe.  *Seiler* is both non-binding on this Court and unpersuasive to this Court's reasoning in light of intervening developments in the law.  *Seiler* was decided more than 15 years ago, long before several Supreme Court decisions (and other non-binding decisions discussed above) clearly limited *Williamson* as a prudential doctrine.  *Seiler* therefore did not consider the various prudential considerations that this Court has discussed above which cut in favor of this Court exercising jurisdiction.

[28] *See Warren v. City of Athens, Ohio*, 411 F.3d 697, 708 (6th Cir. 2005) (holding that just compensation, substantive due process, and procedural due process claims that are ancillary to a takings claim are subject to the ripeness doctrine); *see also Bigelow v. Michigan Dep't of Natural Res.*, 970 F.2d 154, 158-59 (6th Cir. 1992) ("We interpret [Sixth Circuit precedent] as requiring the plaintiffs in this case to *meet the same standard of finality* for both their equal protection and takings claims.") (emphasis added).

argue that in order to establish any of their constitutional claims, Plaintiffs must demonstrate a protected property interest in the "site plan/special project approvals," demonstrate that the City "did not have any discretion in the consideration of the revised site plan and special project, and that the plans were otherwise fully compliant with ordinance requirements."  (Mot. at 24). Defendants argue that the Commission had discretion to approve or deny the revised site plan and special project, and to determine whether or not to grant a parking waiver, and thus Plaintiffs had no right to that approval.

The Constitution does not create or define the property interests it protects.  *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002).  Rather, whether a plaintiff holds a protected property interest depends on "existing rules or on understandings that stem from an independent source, such as state law. . . ."  *Seguin v. City of Sterling Heights*, 968 F.2d 584, 590 (6th Cir. 1992) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564 (1972)).  Generally, to create a constitutionally-protected interest, a person must have a "legitimate claim of entitlement."  *Roth*, 408 U.S. at 577. "A property interest can be created by a state statute, a formal contract, or a contract implied from the circumstances."  *Ludwig v. Bd. of Trustees of Ferris State Univ.*, 123 F.3d 404, 409 (6th Cir. 1997) (citations omitted).

While it is true that usually a plaintiff has no protected property interest where the final decision whether or not to grant approval of a site plan and/or issue a permit is discretionary, *see Triomphe Investors v. City of* Northwood, 49 F.3d 198, 203 (6th Cir. 1995), Defendants' argument is premised on the notion that Plaintiffs were seeking approval in the first instance, which is not the procedural posture of this case.  Instead, Plaintiffs' complaint alleges that they had already received approval for their site plan and special project status, including a waiver of the parking requirement, that they had been issued a building permit, and had substantially

completed construction at which time a stop work order was issued and Defendants required consideration of an amended site plan, based on allegations that the construction as built did not comport to the original approvals.  (Am. Cplt. ¶¶33, 44-46, 57, 60-61).

Under Michigan law, the issuance of a valid building permit, and the substantial reliance thereon, bestows a right on the property owner to begin and continue construction under the terms of the permit.  *Dingeman Advertising, Inc. v. Algoma Township*, 393 Mich. 89, 98-99 (Mich. 1974).  The salient question here, then, is whether the allegations in Plaintiffs' complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" regarding the existence of a protected property interest.  *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).  *See also supra* at 25-26.  As discussed in the preceding paragraph, clearly they do.  At most, Defendants have raised a question of fact on this matter, and at this stage, all such questions must be resolved in Plaintiffs' favor.

In sum, because Plaintiffs allege they hold a valid building permit, and because they allege they have substantially completed construction in reliance thereon in conformance with that permit, the Court finds that Plaintiffs have sufficiently alleged a protected property interest such that their constitutional claims may go forward.

> b.    *Mandamus/Superintending Control*[29]

---

[29]  As the Michigan Court of Appeals explained in *Choe v. Flint Charter Twp.*, 240 Mich. App. 662, 666 (2000), "under the current court rules, writs of mandamus directed against inferior tribunals have given way to orders of superintending control…Because, under MCR 3.302(C), a superintending control order replaces the writ of mandamus when directed to a lower court or tribunal, a municipal zoning authority is subject to the circuit court's superintending control, not its power of mandamus."  *See also* MCR 3.302(C).  Accordingly, Defendants' motion to dismiss should be granted with respect to Plaintiffs' mandamus claim, and the Court here will address only Plaintiffs' claim for superintending control.  Nevertheless, "because the legal rules governing superintending control mirror those governing mandamus," *Mesquite, Inc. v. City of Southgate*, 2008 WL 4334619, at *1 (Mich. App. Sept. 23, 2008), this Court will consider Defendants' mandamus arguments as if they were also made with respect to Plaintiffs'

Superintending control is the "general supervisory control that a higher court in a jurisdiction has over the administrative affairs of a lower court [or tribunal] within that jurisdiction." *Black's Law Dictionary* 403 (10th ed. 2014). "'The writ of superintending control supersedes the writs of certiorari, mandamus, and prohibition, and provides one simplified procedure for reviewing or supervising a lower court or tribunal's actions.' Rather than an appeal, the filing of a complaint for superintending control is an original civil action designed to order a lower court to perform a legal duty. 'The standard for issuing a writ of superintending control is to determine whether the lower court failed to perform a clear legal duty.'" *Rhodes v. City of Southfield*, 2014 WL 4437696, at *1 (Mich. App. Sept. 9, 2014) (internal citations omitted). *See also, Frederick v. Presque Isle Co. Circuit Judge*, 439 Mich. 1, 15; 476 NW2d 142 (1991). "Superintending control may not be used to review an exercise of discretion." *Mesquite, Inc.*, 2008 WL 4334619, at *1 (citing *Wayne Co. Prosecutor v. Recorder's Court Judge*, 156 Mich. App. 270, 274 (1986)).

Defendants first argue that Plaintiffs cannot prevail on their claim for superintending control because "[a]s verified by the public records, Plaintiffs have yet to submit the application and requested information for a final decision by the [Planning Commission]. There was no clear legal duty on the part of the City to approve an incomplete submission…" (Mot. at 34). However, at this stage, taking all of Plaintiffs' well-pleaded allegations, coupled with the Commission minutes that this Court may consider on a motion to dismiss, Plaintiffs have sufficiently alleged that they have submitted everything that the Commission requested for approval on their revised site plan prior to the January 4, 2014 hearing. (Am. Cplt. ¶¶69; 74; 92; Mot. Ex. A, Tabs 38, 55). Although Defendants argue that Plaintiffs were required to submit a

superintending control claim.

brand new application and additional fees, the record does not reflect that the Commission asked for these things in conjunction with consideration of the revised site plan. (Am. Cplt. ¶¶71-73; Mot. Ex. A, Tabs 38-55). Indeed, ahead of the January 4, 2014 meeting, the Commission did not make any reference to remaining deficiencies in the packet, other than it was lacking tabs and other stylistic preferences that do not appear to be a requirement per any of Defendants' regulations governing such submissions. (Mot. Ex. A. Tabs 54, 55). Importantly, the Commission expressly agreed "to receive the documentation provided by [Plaintiffs]." (Mot. Ex. A Tab 55).

Thus, when taking the more limited scope of facts that the Court can consider at the motion to dismiss stage, and drawing all inferences in Plaintiffs' favor, the Court finds that Plaintiffs have adequately pleaded compliance with the application procedures such that they may at least properly allege that Defendants had a legal duty to take one of the actions specified in Section 2703(a).

Defendants assertion that "Sec. 2703(a) does not state that Plaintiffs have a right to a site plan decision in 45 days, but only to be *heard* in 45 days with the PC having the right to request modifications" is inaccurate. (Mot. at 33) (emphasis in original). The statute imposes on Defendants an obligation to take one of three actions; specifically, the statute provides that "Within 45 days after submittal of the site plan to the city by the applicant, the planning commission shall either approve, disapprove, or request modification to the site plan. A resubmittal by the applicant of a modified site plan shall be acted upon by the commission within 45 days after receipt of the modified site plan."

Plaintiffs have adequately alleged, and the documents that the Court may consider do not conclusively refute, that Defendants did not take any of these actions within the specified

timeframe.   While Defendants may have discretion in terms of their ultimate evaluation of Plaintiffs' application, they cannot simply ignore Section 2703's mandates.[30]   Thus, to the extent Plaintiffs' superintending control claim seeks an order from this Court requiring Defendants to act on Plaintiffs' application as directed by Section 2703(a), *see* Resp. at 33 ("The PC has a clear and unambiguous duty ***to take action***…on plaintiffs' revised site plan…") (emphasis added), the Court finds that Defendants' motion to dismiss lacks merit and should be denied.

However, this only gets Plaintiffs half way to the relief they seek.   As noted above, "[s]uperintending control may not be used to review an exercise of discretion," *Mesquite, Inc.*, 2008 WL 4334619, at *1, and the ultimate injunctive relief Plaintiffs seek through their superintending control claim – approval of their amended site plan – is clearly such a decision. Defendants cite to the Michigan Zoning Enabling Act, MCL § 125.3502, which designates that a legislative body may provide a zoning ordinance for special land uses in a zoning district, and which notes, in two separate sections, the discretionary nature of such decisions.   § 1205.3502(2) and (3).   Furthermore, the zoning ordinance provisions governing the factors to be considered in both site plans and special project approval is premised upon the discretionary nature of such decisions.   *See* RZO § 2704 (criteria including deciding whether configuration could be changed to improve impact on adjoining development, extent to which natural features will be preserved and ways elements can be modified to maintain compatibility with traditional character of area); § 2605(6) (listing fourteen different standards by which the planning commission can approve or

---

[30] The Court rejects Defendants' argument that Plaintiffs are not entitled to a decision on their special project status where there is no timeline in the statute mandating the rendering of that decision because Plaintiffs' complaint alleges that Defendants never revoked Plaintiffs' special project approval, and thus Plaintiffs are not seeking re-approval of special project status.   (*See* Mot. Ex. A Tab 29) (discussing revocation of special project status, but approving no formal motion).   Plaintiffs are seeking approval of their amended site plan, a plan they allege was submitted in full in July 2013, at which time Defendants identified no deficiencies in the submission.   (Am. Cplt. ¶¶69, 74).

deny a special project).

As the Michigan court of appeals held with respect to a request for mandamus, such relief:

> will not lie for the purpose of reviewing, revising, or controlling the exercise of discretion reposed in administrative bodies . . . the writ will lie to require a body or an office charged with a duty to take action in the matter, notwithstanding the fact that the execution of that duty may involve some measure of discretion. . . . Stated otherwise, mandamus will lie to compel the exercise of discretion, but not to compel its exercise in a particular manner.

*Lee v Macomb Cnty. Bd. of Comm'rs.*, 235 Mich. App. at 332-333 (quoting *Teasel v Dep't of Mental Health*, 419 Mich. 390, 409-411 (1984); *Carson*, 633 F.3d at 491; *Dowerk v Charter Twp. of Oxford*, 233 Mich. App. 62, 74-75; 592 NW2d 724 (1998) (holding that granting or denying a variance is a discretionary action and defendant was thus not entitled to the requested relief where defendant sought a writ of mandamus to compel the township to grant plaintiff's request for a variance).   This same principle clearly applies to Plaintiffs' request for superintending control.  *Mesquite, Inc.*, 2008 WL 4334619, at *1.  Accordingly, "superintending control" is simply not the proper vehicle, at least at this time, for Plaintiffs to obtain the ultimate relief they seek – approval of their amended site plan.[31]

Thus, to the extent Plaintiffs' claim for superintending control seeks to have the Court "enter an order requiring the City of Rochester and planning commission to lift the stop work order and approve the revised site plan," the Court finds that they have failed to state a claim for relief and that Defendants' motion to dismiss should be granted.

### c.    Breach of Contract

In Michigan, the elements of a breach of contract claim are: "(1) that there was a contract,

---

[31] This is not to suggest that this Court's power to award injunctive relief on any of Plaintiffs' other claims is restricted in any way.

(2) that the other party breached the contract and, (3) that the party asserting breach of contract suffered damages as a result of the breach." *Miller–Davis Co. v. Ahrens Constr, Inc.*, 296 Mich. App. 56, 71 (2012). A valid contract requires "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Calhoun Co. v. Blue Cross & Blue Shield of Mich.*, 297 Mich. App. 1, 13 (2012) (quotation marks and citations omitted).

In Count VI of their amended complaint, Plaintiffs allege that the following facts support a breach of contract claim:

> 133.   The planning commission had the power and authority to waive statutory parking requirements applicable to the [Property].
>
> 134.  The defendants agreed to waive statutory parking requirements in exchange for plaintiffs' agreement to develop [the Property] in a manner that is reasonably compliant with SOI standards.
>
> 135.  The plaintiffs built a building that was, according to the defendants' handpicked expert, in reasonable compliance with SOI standards.
>
> 136.   After the plaintiffs built a building that was in reasonable compliance with SOI standards and had otherwise fulfilled its construction obligations [the] [sic] defendants refused to waive applicable parking requirements.
>
> 137.   The conduct of the defendants, as described herein, constitutes a breach of the parties' development agreement.
>
> 138. The plaintiffs have, has a result of the defendants' breach of contract, suffered damages.

(Am. Cplt. ¶¶133-38).  Defendants argue that those allegations cannot adequately support a claim for breach of contract because "[t]he initial decision to grant a parking waiver based on the preservation of the historic building does not create a 'contract.'  Generally, 'no officer or board,

other than the common council, has the power to bind the municipal corporation by contract.'"[32]

(Mot. at 34) (quoting *Johnson v City of Menominee*, 173 Mich. App. 690, 694 (1988) and

*Manning v Hazel Park*, 202 Mich. App. 685, 691 (1993)).  In other words, Defendants challenge

the existence of a contract due to the Planning Commission's alleged lack of authority to enter

into one.

But, at least at this motion to dismiss stage, Plaintiffs have the better argument.  Facially,

Plaintiffs' allegations assert that the Planning Commission does, in fact, have "the power and

authority to waive statutory parking requirements," *i.e.*, to contract with Plaintiffs.  (Am. Cplt.

¶133).[33]  Defendants do not counter that allegation with any record evidence that this Court may

properly consider at this stage that the Planning Commission did not have the authority alleged

by Plaintiffs.  Nor do they cite to any law which conclusively establishes that Plaintiffs cannot

state a claim for relief.

Rather, Defendants rely on two Michigan Court of Appeals cases that dealt with

employment law matters, *Johnson v City of Menominee*, 173 Mich. App. 690, 694 (1988) and

---

[32] Defendants also argue that, to the extent the approval could constitute a contract, Plaintiffs cannot maintain a claim for breach where they breached first by not constructing the project in accordance with the approved site plan and other conditions of the special project approval. However, as this is a 12(c) review, the Court must construe all facts and draw all inferences in Plaintiffs' favor.  Plaintiffs allege that they did, in fact, reasonably comply with the SOI standards as required by the site plan and special project approval, and otherwise complied with the terms of that agreement.  The ultimate determination of the truth of that allegation is not properly considered on this motion, and the Court finds that Plaintiffs' allegations sufficiently state a claim for breach of contract through Defendants' alleged withdrawal of the parking waiver.

[33] As this part of Defendants' motion to dismiss is made under Rule 12(c), the Court must accept Plaintiffs' well-pled factual allegations, and the "scope of authority" defense raised by the Defendants is generally a question of fact to be decided by a jury.  *Renda v. Int'l Union, United Auto, Aircraft & Agricultural Implement Workers of America*, 366 Mich. 58, 95 (1962); *Slocum v. Littlefield Pub. Sch., Bd. of Educ.*, 127 Mich. App. 183, 194 (1983).  But, even assuming Defendants' motion raises a pure question of law, they still have not shown that Plaintiffs have failed to state a claim for relief.

*Manning v Hazel Park*, 202 Mich. App. 685, 691 (1993).  For instance, in *Johnson*, the plaintiff had applied for employment as an engineer with the City of Menominee.  The City's Personnel and Labor Committee interviewed Johnson, and, according to him, promised him that if hired he would always have a job as long as he performed satisfactorily.  Johnson was hired, but city regulations mandated that his position was for two years, and could only be renewed for successive two-year terms.  He was re-appointed after each of his first three reviews, but was not re-appointed on the fourth.  Johnson sued, claiming that the City breached its agreement to terminate him only for cause.  The Michigan Court of Appeals affirmed the grant of summary disposition on Johnson's breach of contract/wrongful discharge claim:

> It is fundamental that those dealing with public officials must take notice of the powers of the officials.  Persons dealing with a municipal corporation through one of its officers must at their peril take notice of the authority of the particular officer to bind the corporation.  If the officer's act is beyond the limits of his or her authority, the municipality is not bound.  Additionally, individual city council members have no power to bind the municipality.  Generally, no officer or board, other than the common council, has power to bind the municipal corporation by contract.

> * * *

> Title V, § 2 of the 1976 Revised Charter of the City of Menominee provides in part:

> "At the first regular meeting of the council to be held in February in the year 1978 and every two years thereafter, or as soon thereafter as may be, the Mayor, by and with the advice and consent of the council of a 3/5ths vote of the aldermen elect, shall appoint a ... city engineer...."

> In the present case, the Personnel and Labor Committee and individual council members had no authority to reappoint plaintiff Robert Johnson as the city engineer.  The Menominee City Charter expressly limits the authority to appoint the city engineer to the mayor with the consent of a three-fifths vote of the council.  Moreover, the city charter did not provide for employment of the city engineer for a term longer than two years.

*Id.* at 694-95.  Thus, it was the City's own charter which provided the basis for concluding that

the Committee could not have contracted to hire Johnson, let alone to retain him for more than two years at a time.

In *Manning*, 202 Mich. App. at 691, the plaintiff had been a deputy clerk and city manager for the City of Hazel Park.  After she was terminated, she sued the City claiming that the mayor and mayor *pro tempore* had orally promised her that her employment would be terminable only for just cause.  Relying on *Johnson*, the Michigan Court of Appeals found that the mayor and mayor *pro tempore* "were not city council members and could not, through any oral promises, bind the city to an employment contract with plaintiff." *Id.*  But this decision grew out of the court's finding that, "The city's charter provides that the city manager shall hold office by virtue of appointment by the city council…and [that] the city manager holds office at the pleasure of the council." *Id.*  Indeed, the court wrote that, "municipal officers can bind a municipality only if they are empowered to do so by the city charter." *Id.*  (citing *Rasch v. East Jordan*, 141 Mich. App. 336, 367 (1985)).

Thus, the question here is not whether city planning commissions generally have the authority to contract with the applicants who come before them, but whether the City of Rochester's own charter, regulations, ordinances, etc., prohibited the Planning Commission from contracting with Plaintiffs.

Plaintiffs properly note that Defendants have cited no RZO provision that prevents the Commission from binding the municipality to the contract formed by the approval of the site plan, and that the provisions of the ordinance clearly give the Commission broad discretion to approve site plans and waive certain parking requirements in its approval of special projects. Defendants themselves have argued in support of their dismissal of Plaintiffs' mandamus claim that the Commission has been given, by ordinance, broad discretion to approve or deny site plans

56

and special projects, and can incorporate a number of "creative approach[es]" in doing so, including the waiver of statutorily required parking space payments. RZO § 2700 *et seq.*; § 2605(6). Because the City vested the Commission with these particular responsibilities vis-à-vis applicants such as Plaintiffs, and because Defendants cited no Rochester code section that precludes the Commission from binding the City, Plaintiffs have sufficiently alleged the existence of a valid contract to survive Defendants' motion to dismiss.[34]

### d.     Promissory Estoppel

Defendants' argument that Plaintiffs cannot maintain a claim for promissory/equitable estoppel also fails. The elements of a promissory estoppel claim require a plaintiff to allege "(1) a promise (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee and (3) that, in fact, produced reliance or forbearance of that nature (4) in circumstances requiring enforcement of the promise if injustice is to be avoided." *Zaremba Equip, Inc. v. Harco Nat'l. Ins. Co.*, 280 Mich. App. 16, 41 (2008). Similarly, equitable estoppel requires: (1) a party by representation, admission, or silence, intentionally or negligently induces another party to believe facts; (2) the other party justifiably relies and acts on this belief; and (3) the other party will be prejudiced if the first party is permitted to deny the existence of the facts. *Howard Twp. v. Waldo*, 168 Mich. App. 565, 575-

---

[34] Plaintiffs also appear to be correct in arguing that there is no indication from the language of the applicable ordinance that the Commission exceeded its authority in approving Plaintiffs' site plan and special project status, and indeed such authority was reinforced when a building permit was issued for the project with these conditions in place. (Am. Cplt. ¶44). Other ordinances and Michigan statutory language also support the conclusion that the approval could create a binding contract between the parties. MCL 125.3504(5) provides that the "conditions imposed with respect to the approval of a land use or activity shall … remain unchanged except upon the mutual consent of the approving authority and landowner." This provision is mirrored by RZO § 2604(a). Since it is well established that a contract may only be modified by the mutual consent of the parties, *Adell Broadcasting Corp. v. Apex Media Sales, Inc.*, 269 Mich. App. 6, 11, 708 N.W.2d 778 (2005), these statutes imply a contractual relationship in the underlying agreement.

76 (Mich. App. Ct. 1988).

Plaintiffs' estoppel claim alleges that Defendants agreed to waive parking fees in exchange for construction that comported with the approved site plan, did so with the belief that Plaintiffs would be induced to believe these representations, and Plaintiffs justifiably relied on these representations, evidenced by their alleged construction of the project in conformance with the approved site plan.  Plaintiffs allege that Defendants now deny the earlier representations, and seek to have Plaintiffs pay for parking or, in the alternative, contribute to a charity fund, all of which has resulted in prejudice to Plaintiffs.  Defendants argue that the alleged promise to waive the parking requirement was given only as part of a special project approval that required compliance with the original site plan.  Defendants argue that "[t]here is no question that construction does not comply" with that approval, and thus any reliance on that promise by Plaintiffs is not justifiable.

However, as explained above, there is at least a material question of fact as to whether the construction complies with the site plan and special project approvals, and at this stage of litigation, all facts and inferences must be drawn in Plaintiffs' favor.  Therefore, Plaintiffs have adequately pled their estoppel claim, and Defendants' motion to dismiss that claim should be denied.

## III.     CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that Defendants' Motion to Dismiss **[30]** be **GRANTED IN PART AND DENIED IN PART**.  More specifically, the Court **RECOMMENDS GRANTING** the motion as to: (1) Plaintiffs' claim for mandamus; and (2) Plaintiffs' claim for superintending control, but only insofar as that claim seeks "an order requiring the City of Rochester and planning commission to lift the stop work order and approve

the revised site plan." The Court **RECOMMENDS DENYING** the motion in all other respects.


Dated: October 17, 2014                          s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge


## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 17, 2014.


                                                 s/Eddrey O. Butts
                                                 EDDREY O. BUTTS
                                                 Case Manager