# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Lilly Investments, Dentists on
Main, P.C., and Louis E. Leonor,

                Plaintiffs,

v.

City of Rochester and Rochester
Planning Commission,

                Defendants,

and

City of Rochester,

                Counter
                Claimant,

v.

Louis E. Leonor and Lilly
Investments,

                Counter
                Defendants.

Case No. 14-cv-10712
Hon. Judith E. Levy
Mag. Judge David R. Grand

_____/

# OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' OBJECTIONS [80] TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION [77]

This matter is before the Court on defendants' Objection to the Report and Recommendation of October 17, 2014, Granting in Part and Denying in Part Defendants' Motion to Dismiss.  (*See* Dkt. 80.)  The Magistrate Judge recommends granting defendants' Motion to Dismiss, (Dkt. 30), as to plaintiffs' claim for mandamus and plaintiffs' claim for superintending control, insofar as the claim for superintending control seeks "an order requiring the City of Rochester and planning commission to lift the stop work order and approve the revised site plan." (*See* Dkt. 77 at 52.)  The Magistrate Judge recommends denying defendants' motion in all other respects.

Defendant/counter claimant City of Rochester and defendant City of Rochester Planning Commission (collectively "defendants") filed timely objections to the Report and Recommendation, (Dkt. 80), plaintiffs' responded to those objections, (Dkt. 83), and defendants replied.  (Dkt. 86.)

Defendants object to the factual findings set forth in the Report and Recommendation, arguing that the Magistrate Judge makes erroneous factual findings related to Ed Francis, the Special Projects approval process, and the approval process in general.  Defendants also

2

object to the Magistrate Judge's legal conclusions, arguing that plaintiffs' claims are not ripe for adjudication, the Court has no basis for retaining jurisdiction over any part of plaintiffs' claim for superintending control, the wrong legal standard was applied to the breach of contract claim, and plaintiffs' promissory estoppel claim should be dismissed.

For the reasons set forth below, the Court adopts in part and rejects in part the Magistrate Judge's Report and Recommendation.

## I.   Factual and Procedural Background

The Court adopts the factual background set forth in the Report and Recommendation, except as addressed *infra* at III(a). The relevant procedural background is set forth below.

In January 2014, plaintiffs sued defendants, seeking a writ of mandamus, superintending control, injunctive relief, and damages. (*See* Dkt. 1 at 6-25.) Plaintiffs allege in their complaint "taking/inverse condemnation," violation of procedural due process, violation of substantive due process and equal protection, breach of contract, "promissory/equitable estoppel," and violation of 42 U.S.C. § 1983. (*Id.*) Defendants removed to this Court, (Dkt. 1), and counter-sued, alleging

nuisance and seeking a declaratory judgment and permanent injunction. (*See* Dkt. 3.) Both parties filed motions for preliminary injunction. (*See* Dkt. 22; Dkt. 27.)

On April 22, 2014, defendants filed a motion to dismiss, (Dkt. 30), which was referred to Magistrate Judge David R. Grand. (Dkt. 32.) The Magistrate Judge heard oral argument on defendants' motion to dismiss on June 23, 2014, (see Dkt. 72), and issued a Report and Recommendation granting the motion in part and denying it in part on October 17, 2014. (Dkt. 77.) On November 11, 2014, defendants filed objections to the Report and Recommendation. (Dkt. 80.)

## II. Legal Standard

District courts review *de novo* those portions of a report and recommendation to which a specific objection has been made. 28 U.S.C. § 636(b)(1)(C). "*De novo* review in these circumstances entails at least a review of the evidence that faced the magistrate judge; the Court may not act solely on the basis of a report and recommendation." *Spooner v. Jackson*, 321 F. Supp. 2d 867, 869 (E.D. Mich. 2004). But objections to the Report and Recommendation must not be overly general, such as objections that dispute the correctness of the Report and

Recommendation but fail to specify findings believed to be in error. *Spencer v. Bouchard*, 449 F.3d 721, 725 (6th Cir. 2006); *see also Howard v. Sec'y of HHS*, 932 F.2d 505, 509 (6th Cir. 1991). "The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious." *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995).

When considering a facial attack to subject matter jurisdiction, "the district court must assume that Plaintiffs' allegations are true and must construe them in a light most favorable to Plaintiffs." *Little Traverse Bay Bands of Odawa Indians v. Great Spring Waters of Am.*, 203 F. Supp. 2d 853, 855 (W.D. Mich. 2002) (citing *RMI Titanium Co. v. Westinghouse Electric Corp.*, 78 F.3d 1125, 1134-35 (6th Cir. 1996)). But if the motion attacks the factual basis for jurisdiction, the district court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 890-91 (3d Cir. 1977)); *see United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994); *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

A party may not bring a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) after answering the complaint. *See* Fed. R. Civ. P. 12(b)(6). This technical error has "no impact" on a district court's review, though, because courts generally consider such a motion as if it had been brought as a motion for judgment on the pleadings under Rule 12(c). *Satkowiak v. Bay Cty. Sheriff's Dep't*, 47 F. App'x 376, 377 n.1 (6th Cir. 2002); *see, e.g.*, *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 n.1 (6th Cir. 1988); *Wagner v. Higgins*, 754 F.2d 186, 188 (6th Cir. 1985). And a motion for judgment on the pleadings under Rule 12(c) is analyzed using the same standard as for a motion to dismiss under Rule 12(b)(6). *Tucker v. Middleburg-Legacy Place,* 539 F.3d 545, 549 (6th Cir. 2008).

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.,* 684 F.3d 605, 608 (6th Cir.2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plausible claims need not contain

"detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## III.   Analysis

### a. Findings of Fact

Defendants raise several objections to the Magistrate Judge's findings of fact.  In addition to the objections raised in defendants' brief, defendants attach an exhibit "adopted [t]herein as if fully set forth in the text of" the brief, which lists objections to forty-two additional factual findings in the Report and Recommendation.  (Dkt. 80 at 13; Dkt. 80-1.)  The Court will not consider the factual objections included in the exhibit, because they do not comply with the Stipulated Order for Additional Pages and Additional Time to Serve Objection to Magistrate's Report and Recommendation, which set a thirty-five page limit.  (*See* Dkt. 79 at 3 ("Counsel for Defendants assert that a thirty-five page limit is necessary to adequately identify the parts of the Report and Recommendation to which Defendants object and to state with specificity the basis for the objections. . . .  The parties therefore

stipulate and agree to an Order granting Defendants an extension of ten pages pursuant to E.D. Mich. LR 7.1(d)(3)(A) . . . .".).)

### i. Finding that Ed Francis was intended to be the final arbiter of a dispute between the parties.

Ed Francis was retained as an independent historic preservation expert to review plaintiffs' proposal and to prepare a report on whether plaintiffs "reasonably complied" with the United States Secretary of the Interior's guidelines for historic redevelopment ("SOI standards"). (*See* Dkt. 30-2 at 117-18; Dkt. 30-3 at 69-87.) Defendants object generally that the Magistrate Judge makes "multiple errors in [his] characterization of the evidence pertaining to . . . Francis and the role [he] played relative to [p]laintiffs' construction project." (Dkt. 80 at 13.) Defendants argue that the Planning Commission did not hire Francis as an arbiter to resolve the disagreement, as stated in the Report and Recommendation. (*Id.* at 13-14; *see* Dkt. 77 at 10, 34.) This factual finding is critical to the outcome of defendants' motion because it is dispositive on the issue of ripeness. Defendants argue instead that Francis' role was advisory, and that the Planning Commission itself was to "make the final determination as to reasonable compliance." (Dkt. 80 at 13.) According to defendants, this undermines the

8

Magistrate Judge's determination that the Court has subject matter jurisdiction over plaintiffs' constitutional claims.

Defendants take issue with three related factual findings in the Report and Recommendation, on which the Magistrate Judge based his conclusion that Francis was intended to be the final arbiter in the case of a dispute between the parties. First, defendants argue that the Report and Recommendation incorrectly concluded—based on a December 28, 2012 letter from City Manager Vettraino—that Francis would conclusively resolve the disagreement between the parties regarding compliance with the SOI standards. (*Id.* at 14.) The letter provides, in relevant part:

> [T]he Planning Commission provided a very specific remedy if there was a disagreement between Mr. Dziurman, representing the City's Historical Commission, and Designhaus Architecture, representing [plaintiff].
>
> * * *
>
> [I]t is proper for the project to proceed, with the assurances received from the applicant, and with a final review by the City selected expert being done at the conclusion of the project. After the review by the expert, [the Commission should] be provided a complete report from the expert in order to consider if any action is warranted regarding the Special Project approval.

(Dkt. 30-3 at 19).   The Report and Recommendation summarizes the

letter as follows:

> On December 28, 2012, City Manager Vettraino sent a letter
> to the Commission about the project, . . . . [stating] that
> Vettraino believed there was a disagreement between the
> parties regarding compliance and that the Commission
> should invoke its option to solicit the assistance of a
> preservation expert to resolve the disagreement, which
> would take place at the conclusion of the project's
> construction.

(Dkt. 77 at 9-10.)  According to defendants, the letter demonstrates that

the Planning Commission, and not the "City selected expert," (here,

Francis), would resolve any dispute as to compliance with the SOI

standards.  (Dkt. 80 at 14.)  Plaintiffs contend that the reference in the

letter characterizing Francis' recommendation as a "remedy" to any

disagreement indicates that Francis was selected to be the final arbiter

of such a dispute.  (Dkt. 83 at 13-14.)

Vettraino's letter is, at best, unclear as to whether Franics was

charged with resolving any dispute as to the SOI standards.  Although

Vettraino referred to a City selected expert as a "remedy," the letter

also suggests that the Planning Commission would consider whether

any action was warranted on plaintiffs' application *after* receiving the

expert's report.  The Court thus amends the Magistrate Judge's factual

findings to indicate that Vettraino did not indicate in his December 28, 2012 letter that Francis would make the final decision regarding whether plaintiffs had reasonably complied with the SOI standards.

Defendants also object to the Magistrate Judge's finding that "[a]t the January 7, 2013 meeting, the Planning Commission decided to enlist the assistance of a preservation expert . . . to resolve the dispute between the parties as to the project's reasonable compliance with the SOI standards." (Dkt. 77 at 10.)  Plaintiffs do not specifically respond to this objection regarding the January 7, 2013 meeting.  For the same reasons noted above, the evidence suggests that the Planning Commission retained final decisionmaking authority as to compliance even after receiving Francis' report.

Finally, defendants argue that the Magistrate Judge incorrectly found, based on minutes from the February 6, 2012 and March 26, 2013 meetings of the Planning Commission, that the Planning Commission selected Francis as a final arbiter to resolve the parties' dispute.  (Dkt. 80 at 15.)  Plaintiffs highlight the reference to a "third party arbiter" during the meeting as the basis for finding that Francis was intended to be the final arbiter.  (Dkt. 83 at 14.)  Plaintiffs also note that during the

11

June 3, 2013 meeting, the Planning Commission passed a motion providing that the "dispute would be resolved by one process alone," hiring Francis. (Dkt. 27-15 at 10.) The Magistrate Judge found as follows:

> [T]he March 26, 2013 Planning Committee meeting minutes state, "the process in place in case of dispute [as to compliance with the SOI standards] was a third party arbiter as represented by Mr. Francis." The only reasonable interpretation of this language is that if the parties could not agree as to whether the project "reasonably complied" with the SOI standards—and they obviously could not agree on that issue—the Defendants would rely on the determination of the "outside expert" selected by the City—Mr. Francis. . . . [O]n October 1, 2013, Francis issued his report concluding that the project did "reasonably comply" with the SOI [standards]. Thus, as of that date, the issue of "reasonable compliance" with the SOI [standards] should have been resolved in Plaintiffs' favor.

(Dkt. 77 at 35 (internal citations omitted).) The Magistrate Judge rejected defendants' argument that "the final decision . . . was only the Planning Commission's to make." (*Id.* at 34 n.21.)

Although the Magistrate Judge's Report and Recommendation is thoughtfully and carefully reasoned, the Court finds that the meeting minutes do not clearly support a finding that Francis was to be the final arbiter of a dispute between the parties. Francis was referred to as an arbiter only once during the meeting, and by only one member of the

12

nine-member Planning Commission (Mayor *pro tem* Cuthbertson). (Dkt. 30-3 at 90.) Mayor *pro tem* Cuthbertson later indicated that the challenge that *the Planning Commission* faced was to apply the SOI standards in a fair way. Relatedly, Vettraino subsequently noted that Francis "had completed his contract with his report," but the Planning Commission would still be holding a public hearing on the issue. (*Id.* at 91.) And there is no reference in the February 6, 2012 minutes to Francis being the final arbiter of a dispute between the parties. Rather, the minutes reflect that "in the case of a disagreement, an outside expert will be selected . . . and paid for by [plaintiffs]." (Dkt. 30-2 at 117.)

Accordingly, the Court clarifies that Francis was retained to issue a report on whether plaintiffs' construction reasonably complied with the SOI standards, but not that Francis was brought on as a final decisionmaker or that his report was intended to finally resolve any disagreement between the parties regarding compliance with the SOI standards. Although the term "resolve" implies finality, the evidence indicates that the Planning Commission was to make a final decision following Francis' report. The Court therefore does not adopt the

13

factual findings in the Report and Recommendation to the extent that they are inconsistent with this conclusion.

### ii. Whether defendants improperly influenced and failed to share Francis' report regarding compliance with the SOI standards.

Defendants argue that the Magistrate Judge reached "the flawed conclusion that [d]efendants improperly 'influenced' Francis to edit and then failed to share Francis' October 2013 report with [p]laintiffs." (Dkt. 80 at 17.)  The Magistrate Judge made no such finding.  Rather, the Report and Recommendation merely reflects that Francis' reports were "*allegedly* not provided to plaintiffs."  (Dkt. at 16 (emphasis added).)  Moreover, the Report and Recommendation notes that "[i]nfluencing Mr. Francis to edit his report to imply a different purpose for his work does not undo" the "reality" of the Magistrate Judge's finding regarding who had final decisionmaking authority.  (Dkt. 77 at 34 n.21.)  The Court therefore rejects defendants' objection to this factual finding.

### iii. Findings related to the payment-in-lieu-of-parking requirement.

Plaintiffs requested a waiver of the City's payment-in-lieu-of-parking requirement as part of plaintiffs' proposal for Special Project

14

approval.    Defendants object to certain factual findings that the Magistrate Judge made regarding that requirement.

Defendants argue that the Magistrate Judge "repeatedly states that [p]laintiffs were seeking a waiver of the payment-in-lieu[-]of[-] parking requirement." (Dkt. 80 at 18.)  Specifically, defendants take issue with the Magistrate Judge finding that plaintiffs' October 4, 2011 proposal "shows a building 'which would require a waiver of the payment-in-lieu[-]of[-]parking requirement.'" (*Id.* at 19 (quoting Dkt. 77 at 4).)  Defendants argue that contrary to the finding in the Report and Recommendation, "the evidence shows that the City Planner reviewed the plan under the Special Projects review criteria, stated that she assumed [p]laintiffs were seeking Special Projects approval, and instructed [p]laintiffs to include a specific request for a modification of the parking standards as a Special Project if that is what they were seeking." (*Id.* at 19.)  Plaintiffs respond that the objection is immaterial and frivolous.   (Dkt. 83 at 19.)   As defendants' quotation from the Report and Recommendation makes patently obvious, the Magistrate Judge merely found that plaintiffs' October 4, 2011 proposal "would

*require* a waiver," (Dkt. 77 at 4 (emphasis added)), not that one was requested.

And defendants fail to consider the context. During a special meeting of the Planning Commission on September 15, 2011, plaintiffs' architect stated that plaintiffs could pay in lieu of parking if the City would allow construction of a new one-story building, but that it "would be financially impossible to renovate the existing building without the City giving [plaintiffs] free parking." (Dkt. 30-2 at 36.) Plaintiffs' October 4, 2011 proposal called for renovation of the existing structure as plaintiffs' architect described. (*Id.* at 60, 63.) The Court therefore rejects defendants' objection to the Magistrate Judge's factual findings regarding the October 4, 2011 proposal.

Defendants also argue that the Magistrate Judge incorrectly characterized plaintiffs November 18, 2011 letter, which was written in response to some of the Planning Commission's concerns. (Dkt. 80 at 19-20.) The relevant portion of the Report and Recommendation states:

> [O]n November 18, 2011, in response to the Commission's concerns about the site plan, [p]laintiffs sent the [Planning] Commission a letter stating that they would 'retain the original single family residence portion of the structure,' which would serve as the administrative office for a proposed

16

single story addition with duplicated architectural styles.
Plaintiffs also sought a waiver of the payment-in-lieu-of-
parking requirement.

(Dkt. 77 at 4 (internal citations omitted).)  According to defendants:

To qualify the development as a Special Project, [p]laintiffs
had to show that the development provided a special or
unique benefit to the City.  Here, the special benefit provided
to the City relative to the Plaintiffs' site was preservation of
the historical façade of the building.  It is that historic
preservation component that gave the [Planning
Commission] the discretion under the Special Projects
approval standards to modify the parking requirements . . .
allow[ing] for a waiver of $480,000 in parking fees that
Plaintiffs would otherwise be required to pay to the
community.

(Dkt. 80 at 20.)  Plaintiffs respond that the Magistrate Judge's findings
are accurate, and that the letter reflects a request to waive the
payment-in-lieu-of-parking requirement.  (Dkt. 83 at 19-20, 20 n.4.)

The Court finds that the Magistrate Judge's factual description is
accurate.  The November 18, 2011 letter states that a "parking
modification for the 24 . . . spaces is noted and requested per the
[S]pecial [P]rojects approval standards."  (Dkt. 30-2 at 77.)  Defendants
provide no citations to the record to support their argument that
plaintiffs agreed to retain the original structure only in order to qualify

17

for a parking modification.  (*See* Dkt. 80 at 20.)   Nor do defendants provide factual support for their argument that preservation of the historical façade was necessary for plaintiffs to obtain Special Projects approval.  (*Id.*)   Finally, defendants do not cite record evidence in alleging that the parking waiver was worth $480,000 (a number that plaintiffs claim was never negotiated and is still in dispute).  (Dkt. 83 at 19.)

The Report and Recommendation accurately notes that Special Projects approval was required.  (Dkt. 77 at 4.)   And there is nothing inaccurate about the Magistrate Judge's description of plaintiffs' November 18, 2011 letter.  Finally, defendants cite no record evidence to support their arguments in this objection.  Accordingly, the Court rejects defendants' objections regarding the November 18, 2011 letter.

### iv.   Findings related to application of the Rochester Zoning Ordinance to Special Project approval.

The Report and Recommendation states that "[s]ection 2701" of the Rochester Zoning Ordinance ("RZO") "lists the information required for original site plan approval and for special project approval."  (Dkt. 77 at 20.)   Defendants object, arguing that the Report and Recommendation misstates what section of the RZO governs Special

Projects approval.  According to defendants, section 2701 "clearly shows that it applies only to Site Plan approval, not Special Projects approval," while the "standards for Special Projects approval are set forth in Section 2115."  (Dkt. 80 at 21.)  Plaintiffs respond that "the omission is harmless error, as the RZO requires a site plan to be submitted and approved for special projects, which implicates both § 2115 and § 2701 *et seq*."  (Dkt. 83 at 20.)  Plaintiffs also argue that the Magistrate Judge's "clear purpose for citing § 2701 *et seq* was to establish the City's requirement to act on plaintiffs' revised site plan within 45 days and the fact that the RZO does not state requirements for amended or revised site plan or special project approval."

Contrary to defendants' assertion that section 2701 "clearly shows that it applies only to Site Plan approval, not Special Projects approval," (see Dkt. 80 at 21), both section 2701 and also section 2115 contain provisions related to Special Projects approval.  For example, section 2701, titled "Site plan application information," provides that:

> Upon request by the city for special project and special exception uses, the applicant shall, to the extent practical and available, provide information regarding the financial impact the project will have on the city including, but not limited to the following: . . . [d]ocumentation supporting the financial representations made[;] [d]ocumentation

19

> supporting the jobs created or to be created in the city[;] [d]ocumentation supporting representations made concerning anticipated taxable value additions for the city[; and] [d]ocumentation supporting representations made concerning impact of project to the city's infrastructure and utilities.  For all other project requiring site plan review, the applicant may provide such financial impact information, but is not required to do so.

(*See* Dkt. 30-10 at 6-7.)   And section 2115, titled "Special projects approval standards," provides that "[i]n order to encourage the most creative approach to development of the special projects, the city has chosen to create special [sic] projects review process and standards." (Dkt. 30-9 at 2.)  Section 2115 then outlines what "[e]ach applicant for special project approval must . . . submit . . . as part of the application," what "standards shall be applied" in "reviewing an application for special project approval," and what the special project approval process entails.  (*See id.* at 2-3.)

The Magistrate Judge's statement that "[s]ection 2701 lists the information required for original site plan approval and for special project approval," (Dkt. 77 at 20), is thus not incorrect.  To the extent that this portion of the Report and Recommendation is incomplete because it does not also cite section 2115 of the RZO, section 2115 is

also an "applicable zoning ordinance and procedure" that in part governs Special Project approval and is hereby incorporated.

### v. Findings related to statements made by plaintiffs' architect.

The Report and Recommendation states that "[p]laintiffs' architect noted that retention of the existing structure would prevent the creation of onsite parking and that it would be financially impossible to renovate the building without the City waiving the statutorily required parking fees." (Dkt. 77 at 3-4.) Defendants argue that the record shows that Mr. Stuhlreyer, the architect on the project, said that "the property no matter what it is used for will have a parking issue." (Dkt. 80 at 21-22.) Plaintiffs respond that the record supports the Magistrate Judge's factual finding. (Dkt. 83 at 21.)

The meeting minutes indicate Mr. Stuhlreyer made both statements—the one characterized by the Report and Recommendation and also the statement described by defendants. To resolve any ambiguity, the relevant portion of the September 15, 2011 minutes is adopted in its entirety:

> Mr. Peter Stuhlreyer, architect on this project[,] stated that the existing building itself has charter [sic]. However, the

21

problem with this property no matter what it is used for [is that it] will have a parking issue.  The only way he could fit the required parking spaces is to build the building over the parking area.  He asked that the Planning Commission put the design on hold because he can change the design to be the transition between commercial and residential that is being discussed.  It is the question of the parking that they are concerned with at this point.

The question was given to the architect as to whether or not they would consider renovating this building.  Mr. Stu[h]lreyer stated that in order to get the existing building up to usable space it will cost 1.25 times more than the cost of a new building.  It is financially impossible to renovate the existing building without the City giving them free parking.

Mr. Sthulreyer stated that they would be willing to build a one story building that looks like a house and pay in lieu of parking.

(Dkt. 30-2 at 36.)

### vi.  Other findings related to the approval process

Defendants make several other factual objections in their brief, many of which are trivial.  The Court addresses each in turn.

First, defendants argue that the Report and Recommendation incorrectly concluded that plaintiffs' November 2011 site plan referred to the SOI standards.  (Dkt. 80 at 22.)  Plaintiffs respond that the Magistrate Judge's factual finding on this point is immaterial, and

22

defendants' objection is therefore frivolous.  (Dkt. 83 at 22.)  The Report and Recommendation notes, in a paragraph that begins "[o]n November 18, 2011," that the "plan made reference to the United States Secretary of the Interior guidelines" and cites plaintiffs' December 2011 plan, which itself references the SOI standards.  (Dkt. 77 at 4-5; *see* Dkt. 55-5 at 2, 8.)  Accordingly, the Court clarifies that it is the December 2011 plan, rather than the November 2011 plan, which references the SOI standards.

Second, defendants object to the statement in the Report and Recommendation that at its December 5, 2011 meeting, "[t]he [Planning] Commission agreed that although the plan appeared a little 'too loose' to act on, it was sufficiently specific to be forwarded to the City Council for review."  (Dkt. 77 at 5.)  Specifically, defendants argue that only one Planning Commission member made the statement that plaintiffs' proposal was "too loose," and the motion that passed reflects a decision to submit the Special Project and site-plan application to the City Council for comment.  (Dkt. 80 at 23.)  Plaintiffs respond that the record supports the Magistrate Judge's finding.  (Dkt. 83 at 22.)

The December 5, 2011 meeting minutes reflect that the Chair of the Planning Commission stated that he "thought the plan was still too loose to act on as a special project." (Dkt. 30-2 at 96.)  The Planning Commission subsequently voted to forward plaintiffs' plan to the City Council for comment.  (*Id.*)  The Court amends the factual findings to clarify that although the Chair of the Planning Commission believed that plaintiffs' plan was too loose to act on, the Planning Commission voted as a whole to forward the plan to the City Council.

Third, defendants object to the Magistrate Judge's factual finding regarding the removal of the Chinese Elm (or possibly Mulberry) tree. The Magistrate Judge states that:

> According to Plaintiffs' architect, the tree in question turned out to be a Mulberry tree.  He also claims that it was clear to all at the [November 5, 2012] meeting that the tree may not survive and might have to be removed.  Finally, he states that he later learned the tree was rotting from the inside, which precipitated its later removal.  Defendants do not rebut these assertions.

(Dkt. 77 at 8-9 n.8 (internal citations omitted).)  Defendants argue that the Magistrate Judge incorrectly "accepts [p]laintiffs' statement as true without weighing it against [s]ection 2706 of the RZO[,] which requires applicants to construct their site plan in absolute conformity with the

24

approved plan." (Dkt. 80 at 23.)  But the Magistrate Judge did not accept the statement as true, he merely noted the allegation.  The defendants appear to be asking the Court to make the *legal* determination that the removal of the tree "constitutes a violation of City ordinances." (Dkt. 80 at 23-24.)  The Court declines to do so in addressing defendants' "factual" objection.

Fourth, defendants object to the Magistrate Judge's findings regarding the May 28, 2013 letter from City Manager Vettraino.  The Magistrate Judge states in the Report and Recommendation that "[o]n May 28, 2013, City Manager Vettraino sent the [Planning] Commission a letter noting that the [City] Administration had met with [p]laintiffs regarding the revised site plan and was under the impression it would be receiving revised documents promptly, which it did not." (Dkt. 77 at 13.)  Defendants argue that the letter "does not show that the City Administration met with [p]laintiffs to discuss a revised site plan," but rather to review a "revised *landscaping plan*" and "a letter from [p]laintiffs' architect with proposed modifications to the project *which may eventually* be incorporated into a new site plan submittal." (Dkt. 80 at 24 (emphasis in original).)  Plaintiffs respond that the record

supports the factual finding, and that defendants' objection is misleading and frivolous.  (Dkt. 83 at 22-23.)

The Court does not read the Report and Recommendation to suggest that plaintiffs had already submitted a revised site plan to defendants at the time of the May 28, 2013 letter from City Manager Vettraino.  Rather, the Report and Recommendation goes on to note that the letter states that the stop work order was issued for failing "to follow the *original* site plan," and that the City Administration believed that the Planning Commission's options were to either "continue the stop work order . . . or consider the information provided at the May 6 meeting to be adequate and direct Plaintiffs to *prepare* a modified site plan."  (Dkt. 77 at 13 (emphasis added).)  The Court therefore rejects defendants' objection, because the Magistrate Judge did not indicate that plaintiffs had already submitted a modified site plan.

Fifth, defendants object to the Magistrate Judge's finding that "on December 4, 2013, the [Planning] Commission specifically agreed 'to receive the documentation provided by [plaintiffs],' but still failed to take a vote on the project."  (Dkt. 77 at 30-31 (quoting Dkt. 30-3 at 191).)  Defendants argue that the minutes show that plaintiffs failed to

timely submit the required documentation. (Dkt. 80 at 24.) Plaintiffs respond that the Report and Recommendation accurately states what happened at the meeting. (Dkt. 83 at 23.)

The December 4, 2013 meeting minutes reflect that plaintiffs "did not submit the required documentation by the deadline for consideration for this meeting as was agreed to," but that the documentation was nevertheless distributed. (Dkt. 30-3 at 191.) The Planning Commission voted to receive the documentation despite the fact that it was late, but did not vote on the application. (*Id.*) It seems that defendants believe that the Report and Recommendation should have also mentioned that the documentation was late. Although the Report and Recommendation accurately reflects the facts, and this is a very minor, likely inconsequential issue, the Court supplements the Magistrate Judge's findings to note that plaintiffs' documentation was untimely. To the extent that defendants are attempting to shoehorn in a legal determination that distributing documents to the Planning Commission "*at* the meeting . . . is a violation of [Planning Commission] guidelines," (Dkt. 80 at 24-25 (emphasis in original)), the Court declines to do so in addressing defendants' factual objection.

27

Finally, defendants object to the Magistrate Judge's finding that at the January 4, 2014 meeting, the Planning Commission "ultimately relegated the [Elm tree] matter to a non-existing 'subcommittee' rather than take a vote on it."  (Dkt. 77 at 35; Dkt. 80 at 25.)  Defendants argue that the meeting took place on January 6, 2014, and that the subcommittee "was not 'non-existent,'" because the Planning Commission created it during the meeting and identified its members. (Dkt. 80 at 25.)  Plaintiffs respond that the date of January 4, as opposed to January 6, is a harmless error, and that the term "non-existing subcommittee" is proper because the Planning Commission created the subcommittee contemporaneously.  (Dkt. 83 at 23.)

The January 6, 2014 meeting minutes reflect that the subcommittee was formed concurrently with the Planning Commission's referral of plaintiffs' proposals to that subcommittee.  (Dkt. 30-3 at 195.) The Court corrects that the date this meeting took place was January 6 and not January 4.  To the extent the Magistrate Judge's use of the term "non-existing" implies that the committee never existed, the Court clarifies the Magistrate Judge's otherwise accurate factual finding to indicate that the Planning Commission assigned the decision to a

28

*previously* non-existing subcommittee, which was created at the time of the referral.

### b. Conclusions of law

Defendants move to dismiss plaintiffs' takings claim and other federal claims, arguing that these claims are not ripe for adjudication, thus depriving this Court of subject matter jurisdiction. As noted by the Magistrate Judge, courts analyze this issue using a two-prong test. *See Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985). The burden is on plaintiffs to show that (1) the appropriate regulatory body has reached a final decision, and (2) plaintiffs exhausted their state remedies and were unfairly compensated or their state remedies are inadequate to provide just compensation. *See id.* at 186, 195. Because defendants' motion attacks the factual basis for jurisdiction, the Court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *See RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 890-91 (3d Cir. 1977)); *see also United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994); *Ohio Nat'l Life Ins. Co. v. United*

29

*States*, 922 F.2d 320, 325 (6th Cir. 1990). Incidentally, factual findings made for the purpose of analyzing subject matter jurisdiction are non-binding on future proceedings. *Ritchie*, 15 F.3d at 598.

Defendants object to the Magistrate Judge's conclusion that the Court has jurisdiction over these claims. Defendants argue that the Magistrate Judge improperly found that a final decision had been reached on plaintiffs' application. (Dkt. 80 at 16.) But the Magistrate Judge instead recommended that plaintiffs "need not show that they received an actual final decision on their application in order to proceed with their [t]akings claim in this Court," (Dkt. 77 at 33), because "[p]laintiffs' futility argument is supported by substantial evidence." (*Id.*)

The Magistrate Judge accurately described the law regarding finality. In most cases, a showing of finality is critical to a regulatory takings claim because it "informs the constitutional determination whether a regulation has deprived a landowner of all economically beneficial use of the property, or defeated the reasonable investment-backed expectations of the landowner to the extent that a taking has occurred." *Palazzo v. Rhode Island*, 533 U.S. 606, 618 (2001) (internal

quotations and citations omitted); *see also DLX, Inc. v. Kentucky*, 381 F.3d 511, 518 (6th Cir. 2004). "These matters cannot be resolved in definitive terms until a court knows 'the extent of permitted development' on the land in question." *Id*. The Sixth Circuit provides that the policy considerations underlying the finality requirement are:

> First . . . requiring a claimant to obtain a final decision from a local land use authority aids in the development of a full record. . . . Second, and relatedly, only if a property owner has exhausted the variance process will a court know precisely how a regulation will be applied to a particular parcel. . . . Third, a variance might provide the relief the property owner seeks without requiring judicial entanglement in constitutional disputes. Thus, requiring a meaningful variance application as a prerequisite to federal litigation enforces the long-standing principle that disputes should be decided on non-constitutional grounds whenever possible. . . . Finally, since *Williamson County*, courts have recognized that federalism principles also buttress the finality requirement. Requiring a property owner to obtain a final, definitive position from zoning authorities evinces the judiciary's appreciation that land use disputes are uniquely matters of local concern more aptly suited for local resolution.

*Grace Cmty. Church v. Lenox Twp.*, 544 F.3d 609, 615 (6th Cir. 2008) (quoting *Insomnia Inc. v. City of Memphis*, 278 F. App'x 609, 613 (6th Cir. 2008)).

But the finality requirement of *Williamson* is prudential and may be set aside if the evidence shows that any attempt to obtain a final

decision would be futile.  *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1012 n.3 (1992) (finding it was unnecessary to obtain a final determination from a zoning board when it would be "pointless" to make such an effort); *Macdonald v. Cty. of Yolo*, 477 U.S. 340, 350 n.7 (1986) ("A property owner is of course not required to resort to piecemeal litigation or otherwise unfair procedures in order to obtain this determination.").  The finality prong of *Williamson* is therefore met when a plaintiff shows that "the actions of the city were such that further administrative action by [plaintiff] would not be productive." *Bannum, Inc. v. Louisville*, 958 F.2d 1354, 1362-63 (6th Cir. 1992) ("For the exception to be available to an aggrieved landowner, the landowner must have submitted at least one 'meaningful application' for a variance from the challenged zoning regulations.").

The Magistrate Judge analogized the facts of this case to two other cases, one from the Second Circuit and one from the Ninth Circuit, in concluding that it would be futile to require a final decision from defendants.  The Magistrate Judge accurately described those cases as follows:

> [I]n *Sherman*, the Second Circuit found the plaintiff landowner could overcome the finality requirement even

though the town in question had not made a final decision on his application. [*Sherman v. Town of Chester*, 752 F.3d 554, 562-63 (2d Cir. 2014)]. The landowner had purchased a $2.7 million dollar parcel of land, and spent upwards of $5.5 million additional dollars attempting to build on it, as a result of what the court described as the "Town's ever-changing labyrinth of red tape," which included constant changes in zoning ordinances, development moratoriums (some of which *de facto* applied only to the plaintiff's parcel), additional fees, further paperwork filings, and unjustified refusals to put the plan on the agenda. *Id.* at 557-59. The district court dismissed the case, concluding that despite the fact that the plaintiff was required to "jump[] through many hoops—more, perhaps, than sound policy should require," he did not establish an inference that at the end of the process there would be a "brick wall" preventing him from obtaining a final decision. *Id.* at 562-63. The Second Circuit reversed, finding that "[t]he Town will likely never put up a brick wall in between [the plaintiff] and the finish line. Rather the finish line will always be moved just one step away until [the plaintiff] collapses." *Id.* at 563.

A similar conclusion was reached by the Ninth Circuit in *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496 (9th Cir. 1990). There, landowners who were seeking to develop their property with 344 residential units were repeatedly rebuffed and invited to resubmit plans with increasingly smaller and small[er] numbers of units, only to be rebuffed again, and the process repeated. *Id.* at 1506. Each time the landowners submitted a plan that was in compliance with the planning commission's suggestions, the commission rejected the plan, and again requested a new plan with even fewer units. *Id.* The Ninth Circuit, like the

> Second in *Sherman*, ruled that the landowners did not need
> to show a final decision had actually been made in order to
> overcome *Williamson's* finality prong, reasoning that
> "[r]equiring [the landowners] to persist with this protracted
> application process to meet the final decision requirement
> would implicate the concerns about disjointed, repetitive,
> and unfair procedures expressed in *MacDonald* . . ." *Id.*
> (internal citations omitted).

(Dkt. 77 at 32-33.)   Although the Magistrate Judge's Report and Recommendation is thorough and well-reasoned, plaintiffs here have not been met by the consistent and persistent pattern of resistance by the Planning Commission that would satisfy the *Williamson* finality requirement.   On the contrary, while the record demonstrates a relationship that was often contentious, and a process that had been going on for two years, it also illustrates a pattern of legitimate efforts by both parties to engage in the approval process.   Indeed, plaintiffs submitted their initial proposal for approval on September 12, 2011, and following a five-month period of amendments and negotiations, the Planning Commission granted Site Plan and Special Project approval in February 2012.

On October 26, 2012, the Commission condemned plaintiffs' property, citing a "threat to health, safety, and welfare of the public," as

well as a concern that plaintiffs were not in compliance with the approved plan. (Dkt. 30-3 at 2-4.) Plaintiff Dr. Leanor apologized to the Planning Commission for "mistakes" that had been made, and in November 2012, the Planning Commission lifted the condemnation and requested that plaintiffs provide a modified timeline and landscape plan no later than February 2013. (*Id.* at 12, 14-15.) Over the course of the following six months, the parties continued to address their disagreements. As articulated by the independent architect, "all parties involved have had the best of intentions." (*Id.* at 85.)

City Manager Vettraino ultimately issued a stop-work order on May 28, 2013, following a warning that he would do so if plaintiffs did not respond to requests made by the Planning Commission at the May 6, 2013 meeting. (*Id.* 110-11.) Plaintiffs were informed that the stop work order would remain in place until Dr. Leonor or one of his representatives appeared before the Planning Commission. (*Id.* at 121.) And over the next several months, the Planning Commission continued to discuss and debate the project. For example, on August 5, 2013, the Planning Commission reviewed a new city planner's report regarding

plaintiffs' site plan and April 25, 2013 letter.  (*Id.* at 128.)   The city

planner concluded that:

> Most of the conditions noted in the April 25, 2013 letter
> submitted by the applicant have been m[et] at this time.
>
> The [Planning Commission] has never formally approved the
> site plan modifications as presented in the April 25, 2013
> letter . . . .  If the [Planning Commission] is satisfied with
> the proposed modifications[,] action should be taken[] to
> accept the site plan . . . , provided the landscape plan is
> appropriately updated to show all replacement trees, [the]
> porch rail is constructed of authentic wrought iron and the
> details of the floodlights are submitted.

(*Id.* at 129-30.)   The Planning Commission decided that plaintiffs'

attorney and the City Attorney would work together to develop an

agreement, in which the "terms" would be defined "under which the

stop work order might be removed," "certain rights and claims against

the city" would be waived by plaintiffs in "return for removing the stop

work order,"[1] and the Planning Commission would reserve the right to

impose "any additional sanctions."   (*Id.* at 132.)   The Planning

---

[1] The Court is not satisfied that the Planning Commission may require plaintiffs' to
waive their rights and claims against the city as a requirement to proceed with
their application. *Cf. TCG N.Y., Inc. v. City of White Plains*, 305 F.3d 67, 81-82 (2d
Cir. 2002) (invalidating provision of city's franchise agreement proposal that
purported to waive plaintiff's right to challenge agreement in court because it
attempted to circumvent the right to such challenge provided in 47 U.S.C. § 253).

36

Commission decided that there would "be no more action until such agreement [wa]s complete." (*Id.*)

On October 1, 2013, the Planning Commission received an updated report from Francis, in which he concluded that the property "reasonably complied" with the SOI standards. The Planning Commission continued to make requests for additional information from plaintiffs. And in November 2013, the Planning Commission reviewed an application for approval from plaintiffs that it did not believe was complete. The Planning Commission thus tabled discussion of plaintiffs' project until December. On December 4, 2013, the Planning Commission reviewed an updated set of application materials and approved a motion to officially receive them. (*Id.* at 191.)

At the next meeting, the Planning Commission approved a motion "to create a subcommittee of the Planning Commission consisting of Mayor Cuthbertson, Councilmember Russell and Planning Commission Members Tori and Kinsepp." (*Id.* at 195.) This subcommittee was to "meet with [plaintiffs] and [their representatives] to discuss what the expectations [we]re of the Planning Commission, what remain[ed] to be done[,] and to secure a written stipulation between the parties for

settlement purposes in order to address all outstanding issues on the matter." (*Id.*) The evidence does not suggest that the creation of this subcommittee was intended to "move the finish line." Rather, it appears to have been an earnest effort to resolve the dispute between the parties. But shortly after the meeting, plaintiffs filed this lawsuit.

In *Sherman* and *Del Monte*, defendants moved the finish line every time plaintiffs got close to satisfying defendants' demands. Here, there was a period of negotiation, at the end of which plaintiffs received Site Plan and Special Project approval from the Planning Commission. Work commenced, and plaintiffs seemingly violated the plan as approved. The Planning Commission then worked with plaintiffs to resolve the dispute. Both parties have at times demonstrated a sincere effort to resolve the dispute, and both parties have at times been responsible for delays. Despite some of plaintiffs' allegations—for example, that the Planning Commission hid Francis' report, requested a donation in exchange for final approval, and required a waiver of "certain rights and claims against the city" in order to proceed—it was not inevitable or certain that plaintiffs would have been unable to get a final decision on their amended proposal. *See, e.g., Gilbert v.*

*Cambridge*, 932 F.2d 51, 61 (1st Cir. 1991) ("[A]lthough futility can excuse a plaintiff's eschewal of a permit application, the mere possibility, or even the probability, that the responsible agency may deny the permit should not be enough to trigger the excuse.")

Plaintiffs have not satisfied the finality prong of *Williamson*, and their federal claims against defendants are dismissed. *See Bigelow v. Mich. Dep't of Natural Res.*, 970 F.2d 154, 158-59 (6th Cir. 1992) (finality requirement of *Williamson* is applicable to  equal protection claim and also procedural due process claim that "is ancillary to [the] main issue" of "whether the state properly denied full compensation to the plaintiffs," in part because "addressing the plaintiffs' procedural due process claim at this stage of the proceedings would allow future plaintiffs effectively to circumvent the ripeness requirement for takings claims simply by attaching a procedural due process claim to their complaint"); *see also Vashi v. Charter Twp. of W. Bloomfield*, 159 F. Supp. 2d 608, 614 (E.D. Mich. 2001) (substantive due process claim subject to final decision ripeness requirement).  In light of the fact that all federal claims will be dismissed, the Court does not have jurisdiction

to consider plaintiffs' state law claims, and declines to adopt the Report and Recommendation as to the state law claims.

## IV.   Conclusion

For the reasons set forth above, defendants' Motion to Dismiss is granted in part as to plaintiffs' federal claims.   The Court dismisses plaintiffs' state law claims for lack of subject matter jurisdiction.

IT IS SO ORDERED.


Dated: September 25, 2015                s/Judith E. Levy
Ann Arbor, Michigan                      JUDITH E. LEVY
                                         United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 25, 2015.


                                         s/Felicia M. Moses
                                         FELICIA M. MOSES
                                         Case Manager